906 So.2d 710 (2005)
Rosemary Breeden CASEY
v.
NATIONAL INFORMATION SERVICES, INC. and National Investment Corporation.
No. 2004 CA 0207.
Court of Appeal of Louisiana, First Circuit.
June 10, 2005.
Rehearing Denied July 21, 2005.
*712 Robert V. McAnelly, Baton Rouge, for Plaintiff-Appellee Rosemary Breeden Casey.
Ronald J. Savoie, Losavio, Savoie & DeJean, Baton Rouge, for Defendants-Appellants National Information Services, Inc. and National Investment Corporation.
Leu Anne Greco, Baton Rouge, for Defendant-Appellee Sheriff, East Baton Rouge Parish.
Before: PARRO, KUHN, and WELCH, JJ.
*713 PARRO, J.
In this proceeding, an owner of property that was the subject of a sheriff's sale sought to nullify that sale of her property to the assignee of the seizing creditor. Alternatively, she requested a judgment declaring that she had properly exercised an option to purchase the property that had been granted to her by the assignee/purchaser for $23,000. Although the trial court denied these requests, it ordered the assignee/purchaser to pay the full bid price to the sheriff, subject to a credit for any sums already paid. The assignee/purchaser appealed, and the former property owner filed an answer to the appeal. For the following reasons, the judgment of the trial court is amended to reduce the amount which the assignee/purchaser is ordered to pay, and as amended, the judgment is affirmed.

Facts and Procedural History
Rosemary Breeden Casey's property was encumbered by a mortgage executed on August 28, 1984, and recorded on August 29, 1984, in favor of the Baton Rouge Teachers Federal Credit Union (Credit Union) securing a note for $26,750. The property was encumbered by a second mortgage, executed on August 12, 1993, and recorded on August 13, 1993, in favor of the Bank of Zachary (Bank), to secure the payment of a debt evidenced by a collateral mortgage note in the amount of $25,000. Casey waived her homestead exemption in connection with each of these mortgages.
When Casey fell behind in her payments, the Bank filed suit against Casey on its note and mortgage and obtained an ordinary judgment on May 23, 1997, for $24,661.02, together with $701.27 in interest and $1,500 in attorney fees. This judgment, which was recorded on May 28, 1997, also recognized the Bank's mortgage. The Bank then began foreclosure proceedings to collect on its judgment, and a sheriff's sale followed on November 4, 1998.[1] The property was purchased by National Information Services, Inc. (NIS), the judgment creditor, pursuant to an assignment by the Bank, for a bid of $37,333.34, which was two thirds of the appraised value of $56,000. The sheriff's sale and act of cancellation (sheriff's deed) disclosed that the purchase by NIS was made "subject to" prior liens and encumbrances. The sheriff's deed revealed that NIS complied with its bid by paying to the sheriff, in cash, costs totaling $2,246.90. NIS's satisfaction of the bid price was accounted for as follows:

 Clerk of Court and Recorder ......................................... $ 377.75
 Sheriff's costs, commission, deed and process verbal ................ 1,355.75
 Capital City Press .................................................. 349.40
 Appraisers .......................................................... 150.00
 Miscellaneous ...... (FAX COPIES) ................................... 9.00
 Tax Certificate ..................................................... 5.00
 Making a TOTAL CASH PAYMENT OF ...................................... $ 2,246.90
 Purchaser retaining in its hands the following sum to pay ITEM
 FOUR (4) on the Mortgage Certificate ................................ $17,614.66
 Purchaser retaining in its hands the balance of the bid to apply as a
 credit on its claim herein, which amount I have credited to the
 within said Writ .................................................... $17,471.78

*714 On the day of the sheriff's sale, NIS granted Casey an option to purchase the property in question. On November 6, 1998, a representative of NIS demanded the cancellation of the Credit Union's mortgage pursuant to LSA-R.S. 9:5161 on the basis of the failure to reinscribe the mortgage.[2] On April 29, 1999, counsel for the Credit Union filed a "Reinscription of Mortgage" in the public records, attempting to have the August 28, 1984 mortgage reinscribed and reindexed.
Casey arranged for financing from the Credit Union for the additional $29,000 which would be needed to purchase the property pursuant to the option to purchase, and she notified NIS by telephone on or before May 4, 1999, of her decision to exercise the option. On May 21, 1999, Casey followed up with a registered letter of acceptance of the option. Nonetheless, on June 4, 1999, NIS sold the property to National Investment Corporation (NIC) for $72,000. On June 9th, Casey contacted NIS about her desire to go forward with the purchase, only to discover that NIS no longer owned the property.
On November 30, 1999, Casey filed a petition for damages, injunctive relief, declaratory judgment, and mandamus against NIS, NIC, and the sheriff of East Baton Rouge Parish. In her petition, Casey sought to have the court enjoin NIS and NIC from selling, mortgaging, or otherwise encumbering the subject property and from cutting the timber on the property or otherwise injuring the surface of the property. She also requested a judgment declaring she had timely exercised her option to buy the property, the sales of the property to NIS and then to NIC were nullities, and she was the owner of the property. Additionally, Casey demanded that NIS and NIC be ordered to remit the balance of the proceeds owed on the bid price, that is, the difference between the bid price and the balance owed on the foreclosed loan.
By a subsequent motion for summary judgment, Casey sought to have the trial court declare the 1998 sheriff's sale to be null and void based on the bidder's failure to pay the bid price to the sheriff. In this motion, she also sought a declaration that she had timely exercised the option to purchase. NIS also filed a motion for summary judgment, as well as an exception raising the objection of non-joinder of a party, that is, the Credit Union, as a possible superior mortgagee.
After considering the documentation presented in connection with the pending motions, the trial court in written reasons found that at the time of the sheriff's sale, the Credit Union's mortgage had prescribed and was subject to being canceled. Based on these findings, the trial court opined that there was no superior mortgage existing at the time of the purchase by NIS. Accordingly, the trial court found that under LSA-C.C.P. art. 2373, Casey was entitled to recover the difference between the bid price and the balance of the second mortgage. The subsequent judgment essentially granted Casey's motion for summary judgment, denied NIS and NIC's motion for summary judgment, and ordered NIS to pay the full bid price of $37,333.34 to the sheriff, less previously paid amounts. Moreover, the judgment awarded Casey the difference between the bid price and the balance of the debt owed to NIS. Casey's motion for declaratory judgment seeking to have the sheriff's sale declared a nullity was denied, and NIS's exception relative to the non-joinder of the Credit Union was overruled based on a *715 finding that no mortgage existed in favor of the Credit Union at that time. Lastly, the judgment denied Casey's claim that she had exercised the option to purchase from NIS.
Following the trial court's denial of a motion for new trial that had been filed by Casey, NIS appealed, contending that the trial court erred in holding that a prior recorded mortgage did not exist on the date of the sheriff's sale with respect to a subsequently recorded mortgage and in holding that the Credit Union was not a necessary party to the litigation of this action. Casey answered the appeal, seeking to have the trial court's judgment modified to declare that the sheriff's sale was a nullity and to restore her to possession and ownership of the property. Alternatively, she requested that judgment be rendered declaring that she timely exercised her option to purchase the property.

Reinscription
In light of the Credit Union's failure to reinscribe the mortgage within the period provided in current LSA-C.C. art. 3328, the trial court found that a prior recorded mortgage did not exist in favor of the Credit Union on the date of the sheriff's sale. However, the Credit Union mortgage was executed on August 28, 1984; therefore, the law applicable to mortgages on that date governs in this case.[3]
A mortgage is a right granted to the creditor over the property of the debtor for the security of his debt and gives him the power of having the property seized and sold in default of payment. Former LSA-C.C. art. 3278. A mortgage is a species of pledge, the thing mortgaged being bound for the payment of the debt or fulfillment of the obligation. Former LSA-C.C. art. 3279. The mortgage is a real right on the property bound for discharge of the obligation. Former LSA-C.C. art. 3282.
A conventional mortgage is only allowed to prejudice third persons when it has been publicly inscribed on records kept for that purpose and in the manner required by law. Former LSA-C.C. art. 3342. Third persons are all persons who are not parties to the act on which the mortgage is founded. Former LSA-C.C. art. 3343. No mortgage shall affect third parties unless recorded in the parish where the property to be affected is situated. Former LSA-C.C. art. 3347. Any person entitled to a mortgage on the property of another person must cause the evidence of such mortgage to be recorded in the mortgage book of the parish where the property is situated. Former LSA-C.C. art. 3348. The recording of the written instrument establishing a mortgage has the effect of preserving the mortgage, but it shall not constitute evidence of the validity of the debt or claim. Former LSA-C.C. art. 3357. The priority of competing mortgages on immovable property is determined by the date and time of registry in the appropriate public records. See former LSA-C.C. art. 3358; see also former LSA-C.C. art. 3329.[4] The sole requirement to give the mortgagee his rank *716 is the recorder's inscription of the mortgage. Pelican Homestead and Savings Association v. Security First National Bank, 532 So.2d 397, 400 (La.App. 3rd Cir.), writ denied, 533 So.2d 381 (La.1988), citing Progressive Bank & Trust Company v. Dieco Specialty, Inc., 378 So.2d 139, 141 (La.App. 1st Cir.1979). The mortgage first recorded, irrespective of the date of execution, has priority insofar as third parties are concerned. Courshon v. Mauroner-Craddock, Inc., 219 So.2d 258, 264 (La.App. 1st Cir.1968), writs refused, 253 La. 760-62, 219 So.2d 778 (1969).
The effect of the registry ceases in all cases, even against the contracting parties, if the inscription is not renewed in the manner in which it was first made within the applicable periods of time provided for in former LSA-C.C. art. 3369. See former LSA-C.C. art. 3369. The reinscription of a mortgage preserves its effect for ten years from the date of the timely renewal. Former LSA-C.C. art. 3369(E).
The parties in this case do not dispute that the registry of the mortgage in question preserved the evidence of such mortgage for ten years from the date of the obligation secured by the mortgage since the maturity of such obligation was apparently less than nine years from the date of the obligation. See former LSA-C.C. art. 3369. Thus, the mortgage, unless canceled or reinscribed, affected third parties for ten years from its date or until August 28, 1994. Unless reinscribed on or before that date, the effect of the registry of the mortgage ceases in all cases, against third parties and even the contracting parties. See former LSA-C.C. art. 3369(E). However, the language of LSA-C.C. art. 3369(E) is not self-operative. Certainly, the sheriff would not be authorized to make a legal determination of the ranking of security interests without the intervention of the judicial system. Therefore, we conclude that, from the perspective of the sheriff based on the public records, a superior mortgage did technically exist in favor of the Credit Union on the date of the sheriff's sale despite the Credit Union's failure to reinscribe the mortgage within the period provided in former LSA-C.C. art. 3369.

Payment of the Bid Price to the Sheriff
The purchaser shall pay the full purchase price to the sheriff, despite the existence of a mortgage, lien, or privilege on the property inferior to that of the seizing creditor. LSA-C.C.P. art. 2375.[5] However, the payment of the price relative to property that is sold subject to a superior mortgage is governed by LSA-C.C.P. art. 2374, which provides:
If there is a security interest, mortgage, lien, or privilege on the property superior to that of the seizing creditor, the purchaser shall pay to the sheriff only that portion of the sale price which exceeds the amount of the superior security interest, mortgage, lien, or privilege.
Furthermore, under the procedure for judicial sales of property under a writ of fieri facias, the judgment debtor and the seizing creditor may always bid for the property. LSA-C.C.P. art. 2339. Where the seizing creditor submits the highest bid for the property, if the amount of his accepted bid is the amount of his security interest plus costs, he will simply pay the amount of costs to the sheriff. Capital Savings Association v. Runnels, 361 So.2d 458, 462 (La.App. 1st Cir.1978). If the seizing creditor bid the property in this manner, he would obtain it free and clear of all *717 inferior encumbrances. Capital Savings Association, 361 So.2d at 462; see LSA-C.C.P. arts. 2375-2377. However, the property would remain subject to any superior encumbrances. See LSA-C.C.P. arts. 2372 and 2378.
As of November 4, 1998, the public records showed that the Credit Union had a superior mortgage. However, under LSA-C.C.P. art. 2374, NIS had an obligation to pay to the sheriff only that portion of the sale price which exceeded the amount of the superior mortgage held by the Credit Union.[6] Thus, the bid price must initially be reduced by the amount of the indebtedness secured by the Credit Union's mortgage. The balance remaining would then be owed to the sheriff. However, because the amount due to NIS as the seizing creditor was greater than the portion of the sale price owed to the sheriff after reduction for the Credit Union's security interest, NIS's only cognizable obligation was to pay to the sheriff the costs of the sale. Therefore, there was no surplus remaining from which a payment could be made to Casey, the debtor, pursuant to the terms of LSA-C.C.P. art. 2373. Accordingly, under the circumstances of this case and the legal issues involved in this appeal, we find no error or abuse of discretion by the trial court in refusing to declare the sheriff's sale a nullity based on a failure of NIS to pay the sheriff the full purchase price.
In light of the above analysis, we agree with NIS that the sheriff could not have ignored the Credit Union's mortgage. Nevertheless, from a legal viewpoint in this judicial proceeding, we conclude that the effect of registry of the Credit Union mortgage ceased by operation of law, such that there was no enforceable superior mortgage with respect to NIS. See former LSA-C.C. art. 3369(E). We find that equity demands that NIS not be enriched by a technical hiatus in the procedural posture of the case. If the inscription of the Credit Union's mortgage had been cancelled the day before the sheriff's sale, there could be no dispute that LSA-C.C.P. art. 2373 would have applied and Casey would have been entitled to the surplus. NIS should not be allowed to benefit from the mere absence of an erasure of the inscription of the Credit Union mortgage due to the fact that the parish recorder had not yet been requested to perform his ministerial duty in this regard. See LSA-C.C. art. 4.[7]
Based on our conclusion and holding, the registry of the Credit Union mortgage no longer had the effect of a superior mortgage relative to the Bank's mortgage, and therefore, we do not apply the provisions of LSA-C.C.P. art. 2374. Absent an effective superior mortgage, the amount of the bid price that NIS owed would be determined by reducing the bid price by the amount owed to itself as the seizing creditor. Of the balance of that amount, $2,246.90 has already been paid to the sheriff by NIS, and the judgment provided for a credit for any sums already paid. Thus, the amount of the sale price for which NIS is responsible to pay should be the remainder of the sale price after deducting $2,246.90, as well as the amount of the debt, plus interest and attorney fees, that was secured by the mortgage assigned to NIS. Accordingly, the balance *718 owed following these reductions constitutes a surplus under the facts of this case and shall be distributed to Casey.

The Credit Union as a Necessary Party
When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. LSA-C.C.P. art. 1880. Furthermore, the joinder of parties needed for a just adjudication is addressed in LSA-C.C.P. art. 641, which provides as follows:
A person shall be joined as a party in the action when either:
(1) In his absence complete relief cannot be accorded among those already parties.
(2) He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either:
(a) As a practical matter, impair or impede his ability to protect that interest.
(b) Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.
Thus it is necessary for us to determine if the Credit Union is the type of person described in LSA-C.C.P. arts. 641 and 1880.
Casey's petition for declaratory judgment involved an attempt to nullify the sheriff's sale to NIS for its alleged failure to pay the full bid price. As can be seen from the preceding sections of this opinion, a determination as to whether there was any mortgage on the public records that was superior to the one held by NIS was necessary in order to resolve Casey's claim that NIS failed to pay the bid price. In examining the issue of whether the Credit Union is needed for a just adjudication of this matter, we consider the following case cited by Casey.
A seizing creditor in Consolidated Credit Corporation of Baton Rouge v. Forkner, 219 So.2d 213, 214 (La.App. 1st Cir.1969), who purchased the property at the sheriff's sale, filed a petition for declaratory judgment asking the court to declare how the proceeds from the sale of the property should be distributed. Since the trial court judgment being appealed involved the ranking of claims against the defendant's property and the plaintiff had failed to make the first mortgage holder a party to the declaratory judgment action, the court was compelled under the provisions of LSA-C.C.P. arts. 641 and 1880 to reverse the judgment and remand the case for joinder of the first mortgage holder, as well as any other privileged creditors. Consolidated Credit Corporation of Baton Rouge, 219 So.2d at 214.
The facts of the instant case are distinguishable from those of Consolidated Credit Corporation in that the property in question was no longer subject to the Credit Union's mortgage when this suit was filed because the inscription of that mortgage had been cancelled a couple of days after the sheriff's sale by NIS pursuant to LSA-R.S. 9:5161. In light of the cancellation, the Credit Union ceased to have any real right to the property. Accordingly, the joinder of the Credit Union was not needed for a just adjudication of the matter before the court. Accordingly, we find no error in the trial court's overruling of NIS's objection of non-joinder.

Exercise of the Option to Purchase
Casey sought a judgment declaring that she had timely exercised her option to purchase the property in question from NIS, which was denied by the trial court. *719 An option to buy, or an option to sell, is a contract whereby a party gives to another the right to accept an offer to sell, or to buy, a thing within a stipulated time. An option must set forth the thing and the price, and meet the formal requirements of the sale it contemplates. LSA-C.C. art. 2620. An option must satisfy the requirements for perfection of the contract of sale as set forth in LSA-C.C. art. 2439,[8] as well as the formal requirements as provided in LSA-C.C. art. 1839.[9] LSA-C.C. art. 2620, Revision Comments1993, comment (g).
The acceptance or rejection of an offer contained in an option is effective when received by the grantor. Upon such an acceptance the parties are bound by a contract to sell. LSA-C.C. art. 2621.
A contract is formed by consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances clearly indicates consent. LSA-C.C. art. 1927. When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form. LSA-C.C. art. 1947. Acceptance of a contract need not mirror the form of the offer unless the parties contemplate a certain form or the offer states that acceptance must be in that form; circumstances of each case must control.[10]Baldwin v. Bass, 28,984 (La.App. 2nd Cir.12/11/96), 685 So.2d 436, 439, writ denied, 97-0111 (La.3/7/97), 690 So.2d 20. A party claiming the existence of a contract has the burden of proving that the contract was perfected between himself and his opponent. Pennington Construction, Inc. v. R A Eagle Corporation, 94-0575 (La.App. 1st Cir.3/3/95), 652 So.2d 637, 639.
The trial court's determination that the option had not been exercised because Casey had failed to comply with the form and time requirements specified in the option contract is a finding of fact that may not be disturbed on appeal unless clearly wrong. See Enterprise Property Grocery, Inc. v. Selma, Inc., 38,747 (La. App. 2nd Cir.9/22/04), 882 So.2d 652, 655, writ denied, 04-2640 (La.12/17/04), 888 So.2d 876; Baldwin, 685 So.2d at 439.
The option to purchase between NIS and Casey dated November 4, 1998, provided, in pertinent part:[11]
National Information Services, Inc.,... in consideration of ... ($23,000.00) cash ... grants unto [Casey] ... until May 4, 1999 and subject to the conditions hereinafter set forth, the exclusive right, privilege, or option to purchase for... ($29,000.00) additional cash, for a *720 total sales price of ... ($52,000.00) the [property subject to this litigation.]
In the event [Casey] desires to exercise the option herein granted, she shall send a registered letter to [NIS at its address]. In such event the act of sale of the hereinabove described property shall be passed before vendor's notary within forty-five [(45)] days of the date of the posting of said registered letter. If the act of sale is actually passed within said period the amount of option payments previously remitted shall be applied on the total purchase price of Fifty Two Thousand and 00/100 ($52,000.00) Dollars and the balance thereof shall be paid in cash at the time of the passing of the act of sale. In the event that the said option is not properly exercised within the time periods established above, or the act of sale is not passed, because of any default by the purchaser, within the period of sixty (60) days after she shall have posted such registered letter to the seller, [Casey] shall have no right or claim whatsoever to said amount of option payments or lease payments or any part thereof, which said sum shall at that time become the property of the seller as liquidated damages, without demand or the necessity of placing the purchaser in default, both of which being hereby expressly waived. It is further understood and agreed that time is of the essence of this contract and that all rights of the buyer hereunder shall cease and terminate if not exercised within the time period set forth above to exercise the option.
Casey submits that prior to the May 4th deadline set forth in the option contract, she lined up financing from the Credit Union for the additional $29,000 needed to purchase the property and that she had notified NIS by telephone of her decision to exercise the option. No registered letter of acceptance of the option was forthcoming on or prior to May 4, 1999, and it was not until May 21, 1999, that such a letter was sent. After considering this evidence and the terms of the option contract, the trial court held that the option was not timely exercised in that a telephone call followed by an untimely registered letter was insufficient.
Casey asserted that the method for acceptance of the option was not clearly set forth in the option contract. It is not disputed that the option had to be exercised on or before May 4, 1999. Moreover, the option contract indicated that the option would be "subject to the conditions hereinafter set forth." The contract clearly states that Casey had to send a registered letter to NIS in order to exercise her option to purchase the property. This condition indicates that the parties contemplated a certain form of acceptance. Thus, the option to purchase would not be considered to have been exercised until it had been accepted in that form, i.e., a registered letter. Since the option is considered not to have been exercised until a registered letter had been sent to NIS and because the date on which her right to exercise the option expired was May 4, 1999,[12] we are unable to find the trial court manifestly or legally erred in finding that Casey failed to prove that she had exercised her option in accordance with the form contemplated by the parties.

Decree
For the foregoing reasons, the judgment of the trial court is affirmed, except with respect to the manner of payment and the *721 amount NIS was ordered to pay. The amount owed shall be the balance remaining after deducting from the bid price the sum of $2,246.90, as well as the amount of the debt, plus interest and attorney fees, that was secured by the mortgage assigned to NIS, which surplus is to be distributed to Casey. Costs of this appeal are assessed equally to Rosemary Breeden Casey and National Information Services, Inc.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.
KUHN, J., concurs and assigns reasons.
KUHN, J., concurring.
I write separately to point out that Casey neither alleged an unjust enrichment claim nor challenged the validity of the option to purchase contract. In light of her pleadings and the principles we are bound to follow as an appellate court, this most inequitable result is, unfortunately, technically correct.
NOTES
[1] The mortgage certificate disclosed the existence of the Credit Union's mortgage, which had been recorded prior to the Bank's mortgage. The Bank assigned its rights in the August 12, 1993 note and mortgage to National Information Services, Inc. (NIS) on November 3, 1998. NIS was substituted for the Bank in the underlying proceedings relative to the pending sheriff's sale.
[2] NIS did not make any payment to the Credit Union on Casey's debt.
[3] See 1992 La. Acts, No. 1132, § 7, which provides that the provisions of Act 1132 relative to the time for inscription of mortgages are applicable only to those mortgages created on or after January 1, 1993. Section 7 further provides that mortgages created before January 1, 1993, shall continue to be regulated by the laws in existence before January 1, 1993. Unless otherwise specified, legal references used in this section of this opinion are to those that were in effect on the date the mortgage in question was executed.
[4] Among creditors, the mortgage has force only from the time of recording it in the manner directed by law. Former LSA-C.C. art. 3329.
[5] Codal references in this section are to the current law which was in effect on the date of the sheriff's sale in question.
[6] The property was subject to the superior mortgage of the Credit Union. See LSA-C.C.P. art. 2372.
[7] LSA-C.C. art. 4 provides:

When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity. To decide equitably, resort is made to justice, reason, and prevailing usages.
[8] According to LSA-C.C. art. 2439, a sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale.
[9] LSA-C.C. art. 1839 provides:

A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.
[10] Under LSA-C.C. art. 2620, an extension of the time stipulated in an option to buy immovable property must be in writing. LSA-C.C. art. 2620, Revision Comments  1993, comment (d).
[11] The option was recorded on May 24, 1999.
[12] When read as a whole, we conclude that the option contract called for acceptance by registered mail on or before May 4, 1999, and that all rights of Casey ceased and terminated "if not exercised within the time period set forth ... to exercise the option."