929 So.2d 84 (2006)
IMPERIAL CHEMICALS LIMITED
v.
PKB SCANIA (USA), INC. and Inchcape Testing, Inc.
No. 2004 CA 2742.
Court of Appeal of Louisiana, First Circuit.
February 22, 2006.
*87 Kathleen Kay, Lake Charles, for Plaintiff-Appellee Imperial Chemicals Insurance Limited.
S. Daniel Meeks, Metairie, for Defendants-Appellants PKB Scania (USA), Inc. and Inchcape Testing, Inc.
Robert J. Barbier, New Orleans, for Defendant-Appellee Hagenaes Management.
Before: WHIPPLE, McCLENDON, and WELCH, JJ.
WELCH, J.
In this appeal, PKB Scania (USA), Inc. and Inchcape Testing Services, Inc., defendants, challenge a judgment against them for losses associated with a contaminated shipment of fertilizer. The trial court determined PKB Scania (USA), Inc. breached a contractual duty to Incitec Limited, the importer of the fertilizer, to ensure the cleanliness of the ship hold[1] in which the fertilizer was transported. After a thorough review, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
Top Australia is an Australian company that purchased fertilizer from suppliers located in the United States. In the late 1980s and early 1990, Top Australia hired Cal-Chem Metals, Inc., owned by Donald Nickerson, to arrange vessel inspections of ships carrying fertilizer from the United States to Australia. In turn, Mr. Nickerson, as Top Australia's agent, hired marine surveyors to perform inspections of those vessels.
In early 1990, at the direction of Top Australia officials, Mr. Nickerson telephoned PKB Scania (USA), Inc. ("PKB"), a marine survey company with offices in New Orleans, Louisiana, regarding its inspection fees. He spoke to Captain Ray Ramos, who after the telephone call, sent Mr. Nickerson a memorandum, dated January 11, 1990, outlining PKB's fees for its inspection services, including specific fees for: sampling continuous during loading/cargo inspection/temperature recording; draft surveys; lab analysis; transportation; courier; communication; and report/certification. Mr. Nickerson replied to the memorandum in an undated letter, wherein he accepted PKB's quote on Top Australia's behalf, advised that Top Australia was expecting to load a shipment of fertilizer in the New Orleans area soon, and that instructions regarding PKB's inspection of the shipment would be sent shortly. On February 13-16, 1990, a PKB marine surveyor attended the loading of Top Australia's fertilizer shipment onto the M/V NEW LAPIS at the Agrico terminal in Donaldsonville, Louisiana, and provided inspection services to Top Australia.
At some time in 1990, Mr. Nickerson discontinued his relationship with Top Australia and began arranging vessel inspections for Incitec Limited ("Incitec"), another Australian entity that purchased fertilizer from United States suppliers. As Incitec's agent, Mr. Nickerson continued to use PKB's inspection services for certain fertilizer shipments originating in the United States.
*88 After hiring Mr. Nickerson as its agent, Incitec purchased over 4,200 metric tons of diammonium phosphate fertilizer (DAP) from Phosphate Chemicals Export Association, Inc. The DAP was to be shipped from the Agrico terminal in Donaldsonville to Incitec facilities in Australia, aboard the M/V MARY ANNE. The M/V MARY ANNE arrived at the Agrico terminal on May 17, 1990, and the loading of the DAP into Hold Number 3 of the ship began shortly after midnight. A PKB marine surveyor, Captain Julius Sedek, attended the loading of the DAP and provided the inspection services that are the subject of this litigation.
After the DAP was loaded, the M/V MARY ANNE left Donaldsonville and sailed to Incitec facilities in Australia, arriving over one month later. The DAP in Hold Number 3 of the M/V MARY ANNE was unloaded and stored. In February 1991, Incitec personnel discovered sunflower seeds in the DAP that had been shipped in Hold Number 3.[2] Incitec notified the Australian Quarantine Inspection Service and learned that there was a prohibition against the import of sunflower seeds into Australia. After investigating alternative solutions for handling the contaminated DAP, in November 1991, Incitec ultimately sold and shipped it to Farmix Fertilizers Corporation, a corporation located in the Philippines.[3]
On April 2, 1991, Mr. Nickerson sent PKB a letter by facsimile transmission advising of its potential liability for Incitec losses associated with the contaminated DAP. PKB denied receiving this letter. Also, in October 1991, Incitec notified its insurer, Imperial Chemicals Insurance Limited ("IC Insurance"), of a possible claim for losses associated with the contaminated DAP. In February 1992, Incitec released IC Insurance from further liability, and on April 3, 1992, IC Insurance paid Incitec $251,400.70 (Australian dollars).
On November 2, 1993, IC Insurance filed this suit against PKB, alleging PKB was liable for the damages IC Insurance paid to its insured, Incitec.[4] IC Insurance alleged that PKB breached its contractual duty to Incitec to "inspect and assure that Hold [Number] 3 of the M/V MARY ANNE was clean, dry, and free from foreign material prior to loading of cargo." In a supplemental petition filed January 9, 1995, IC Insurance added Inchcape Testing Services, Inc. ("Inchcape") as a defendant, alleging that PKB had been dissolved and that Inchcape was its sole shareholder and liable for PKB's debts.
After considerable pretrial activity, including removal to and remand from federal court, the addition and dismissal of other parties, and the resolution of numerous motions, the trial court ultimately conducted a bench trial of IC Insurance's claims against PKB and Inchcape (collectively, *89 "PKB") on November 21-22, 1995. The court left the record open for supplementation with post-trial depositions, which were filed in December 1999. On February 24, 2000, the trial court set briefing deadlines for post-trial memoranda, and the parties eventually complied. On July 9, 2003, the trial court signed a judgment in favor of IC Insurance and against PKB for $251,400.70 (Australian),[5] plus costs and legal interest from April 3, 1992, until paid. The trial court later granted PKB's motion for new trial on the issue of prejudgment interest. On September 17, 2004, the trial court signed another judgment, wherein it ruled on the motion for new trial. In the September 17, 2004 judgment, the trial court awarded the same amount on the principal demand against PKB; it amended the judgment, however, to allow interest to run from April 3, 1992, to August 12, 2002; to suspend the accrual of interest from August 12, 2002 to September 17, 2004; and to reinstitute the running of interest as of September 17, 2004.
PKB appeals from the September 17, 2004 judgment. In five assignments of error, PKB contends the trial court erred in finding that PKB and Incitec entered into a contract for PKB to conduct a hold cleanliness inspection of Hold Number 3 of the M/V MARY ANNE; contends that, if such a contract did exist, PKB did not breach it and that a limitation-of-liability clause in the alleged contract limited PKB's liability; contends the trial court erred in failing to find IC Insurance's claim against PKB was barred by laches; and contends the trial court abused its discretion in awarding IC Insurance prejudgment interest.

THE CONTRACT BETWEEN PKB AND INCITEC

The "Offer" by Captain Ramos and the "Acceptance" by Mr. Nickerson
As part of its first assignment of error, PKB argues the contract with Incitec was formed by Captain Ramos' "offer" in his January 11, 1990 memorandum to Mr. Nickerson, wherein he outlined PKB's fees for inspection services, and in Mr. Nickerson's "acceptance" as set forth in his undated reply letter to Captain Ramos. PKB argues the trial court erred in looking beyond the four corners of these documents to determine the object of the contract.[6] As explained below, our review of these documents leads to the conclusion that they did not contractually bind Incitec.
In early 1990, at the time these documents were exchanged, Mr. Nickerson was acting as an agent for Top Australia, not for Incitec. Captain Ramos' January 11, 1990 memorandum is addressed to "Top Australia" and then to the attention of Mr. Nickerson. Mr. Nickerson's reply letter is on his own company's stationary (Cal-Chem Metals, Inc.) and indicates "[w]e are pleased to accept your FAX quote of January 11, 1990 and nominate you for Top Australia's next shipment loading in the... New Orleans area." (Emphasis added.) Further, Mr. Nickerson testified in a deposition that he initially contacted PKB about its inspection services, because Top Australia was unhappy with a previous *90 marine surveying company Mr. Nickerson had used and wanted a change. He also testified that he represented Incitec as an agent for arranging vessel inspections after he represented Top Australia in that capacity. Finally, we note that Incitec is not named in either of the documents by which PKB seeks to contractually bind it.
A principal is bound to perform the contract that its mandatary, acting within the limits of his authority, makes with a third person. La. C.C. art. 3020. Thus, even if we were to accept PKB's argument that the referenced documents constitute a contract, it was Top Australia that was bound to perform the written contract that Mr. Nickerson, its mandatary, made with PKB. Incitec was not bound by the four corners of that contract, because Mr. Nickerson was not acting as Incitec's mandatary when the exchange of documents took place.[7] A written contract is not binding on a party unless he, or in this case, his mandatary, is a signatory to it. See Pennington Construction, Inc. v. R A Eagle Corporation, 94-0575 (La.App. 1st Cir.3/3/95), 652 So.2d 637, 639. Thus, we find no merit in PKB's argument that the trial court erred in going beyond the four corners of the exchanged documents to determine the object of the contract.

The Object of the Contract Between PKB and Incitec
Having found there was no written contract between PKB and Incitec, we next review the trial court's implicit finding that an oral contract existed between the parties. We note that the parties do not dispute the existence of the contract, only the object of that contract. In reasons for judgment, the trial court concluded the parties contracted to have PKB perform a "hold cleanliness inspection" of Hold Number 3, the compartment into which the DAP was to be loaded  that is, PKB was to assure Incitec that the hold was clean, dry, and contained no foreign matter when the DAP was loaded. PKB contends the trial court erred because the contract only obligated it to perform a "cargo inspection," which did not require an inspection of the hold to assure cleanliness, but only required that PKB periodically take samples of the DAP as it was being loaded to monitor its temperature and moisture content.
A contract is formed by consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances clearly indicates consent. La. C.C. art. 1927; Casey v. National Information Services, Inc., XXXX-XXXX (La.App. 1st Cir.6/10/05), 906 So.2d 710, 719. When a writing is not required by law, a contract not reduced to writing, for a price or value above $500.00, must be proved by at least one witness and other corroborating circumstances.[8] La. C.C. art. 1846; Suire v. Lafayette City-Parish Consolidated Government, XXXX-XXXX (La.4/12/05), 907 So.2d 37, 58. To meet the burden of proving an oral contract by a witness and other corroborating circumstances, a party may serve as his own witness and the "other corroborating circumstances" may be general *91 and need not prove every detail of the plaintiff's case. Pennington Construction, Inc., 652 So.2d at 639. The corroborating evidence, however, must come from a source other than the plaintiff. Id. Whether there were corroborating circumstances sufficient to establish an oral contract is a question of fact, and our review of the factual conclusions is limited to a review of the entire record to determine if those conclusions are clearly wrong. Id.; Percy v. Perkins, 468 So.2d 815, 818 (La.App. 1st Cir.), writ denied, 475 So.2d 355 (La.1985).
In reasons for judgment, the trial court noted that its conclusion that PKB and Incitec contracted for PKB to perform a hold cleanliness inspection was based on its evaluation of witness testimony. In two depositions, Mr. Nickerson testified that Incitec officials were very concerned about the cleanliness of the holds into which its internationally bought cargo was loaded due to stringent Australian quarantine regulations. Incitec officials continually cautioned him to emphasize to any marine surveyor he hired that hold cleanliness was crucial, because contaminated fertilizer arriving at Incitec facilities would be subject to quarantine. Mr. Nickerson further testified that, as Incitec's agent, he repeatedly communicated these concerns to Captain Ramos of PKB, as well as to Captain Mohammed Kahn, PKB's Operations Manager, and to the actual PKB surveyors sent to inspect each of Incitec's cargo loads.
The testimony of Captain Julius Sedek, the PBK marine surveyor who actually performed the inspection of the M/V MARY ANNE, provides corroborating evidence that the object of the contract between PKB and Incitec was the performance of a hold cleanliness inspection.[9] At trial, Captain Sedek testified that he had been a marine surveyor for approximately seven years and had performed thousands of vessel inspections. Although he did not specifically remember his inspection of the M/V MARY ANNE, Captain Sedek relied on the certificate of hold cleanliness and the report issued after the inspection, and his general knowledge as to the routine he typically followed when conducting cargo hold inspections. He testified that he would have been instructed by his PKB superintendent to go to the Agrico terminal in Donaldsonville to perform an "inspection, attending[,] and sampling." He would have met with the ship captain and then would have begun his inspection by inspecting the hold into which the cargo was to be loaded. Captain Sedek stated that any "routine" cargo inspection he performed always included an inspection of the hold for cleanliness.
In fact, after his inspection of the M/V MARY ANNE, Captain Sedek issued a "Certificate of Hold Cleanliness," indicating that he had inspected Hold Number 3 and found it suitable for the loading of DAP. The record shows that he issued the certificate at the request of the M/V MARY ANNE'S chief mate, and not at the *92 request of an Incitec representative, but Captain Sedek testified that he would not have issued the certificate if a hold cleanliness inspection had not been done. Consistent with Captain Sedek's testimony, we note that PKB's "Inspection, Loading, and Sampling Certificate" issued with regard to the loading of DAP onto the M/V MARY ANNE states, "Cargo hold [number] 3 was inspected prior to the loading and found to be visually clean, dry, and [does] not contain any foreign material and was suitable for loading fertilizer cargo."
The testimony of PKB representatives, Captain Ramos and Captain Kahn, is contrary to the evidence indicating the contract between PKB and Incitec required a hold cleanliness inspection. At trial, Captain Ramos emphatically testified that Mr. Nickerson, as Incitec's agent, did not hire PKB to perform a hold cleanliness inspection aboard the M/V MARY ANNE, but only a "cargo inspection," requiring the PKB marine surveyor to sample the cargo as it was being loaded into the hold to establish its quality by monitoring its temperature, moisture content, and particle size. Captain Ramos denied that Mr. Nickerson ever discussed Australian quarantine regulations with him and indicated that it was not until after the "incident" (referring to the discovery of the contamination of the DAP from Hold Number 3 of the M/V MARY ANNE) that Mr. Nickerson asked PKB to perform hold cleanliness inspections for Incitec.
Captain Ramos testified that there was a difference between an "official inspection," which included a hold cleanliness inspection, and an "unofficial inspection," whereby the surveyor might look into the hold briefly, but that the latter did not qualify as a hold cleanliness inspection. He stated that the language from PKB's "Inspection, Loading, and Sampling Certificate" indicating that "Cargo hold [number] 3 was inspected prior to the loading and found to be visually clean, dry, and [does] not contain any foreign material and was suitable for loading fertilizer cargo" was standard language in PKB's certificates, but such language did not necessarily mean that a hold cleanliness inspection had been requested or performed. At one point, he testified that there was a separate charge for a hold cleanliness inspection and that Incitec had not been billed for the separate charge for the M/V MARY ANNE inspection, but later admitted that PKB did not always charge for a hold cleanliness inspection when one may have actually been performed.
Consistent with Captain Ramos' testimony is the testimony of Captain Mohammed Kahn, PKB's Operations Manager, who was in charge of dispatching PKB marine surveyors for vessel inspections. According to Captain Kahn, when PKB began doing inspections for Incitec, he was told by Captain Ramos that Incitec only wanted cargo inspections, analysis, and draft surveys, but did not require hold cleanliness inspections. He stated that Incitec did not ask for hold cleanliness inspections until a year or two after PKB began performing vessel inspections for Incitec. Captain Kahn denied instructing Captain Sedek to perform a hold cleanliness inspection aboard the M/V MARY ANNE, but testified that Captain Sedek was a "very particular, very careful surveyor" who may have performed more services than requested. Captain Kahn agreed with Captain Ramos that PKB's standard report language indicating that a hold had been "inspected prior to the loading and found to be visually clean, dry, and [does] not contain any foreign material and was suitable for loading fertilizer cargo" was "customary" language but did not mean that an "official hold inspection" had been performed.
*93 In addition to the above testimony, the parties expended considerable effort attempting to prove the object of the contract at issue by reference to vessel inspections PKB performed at Mr. Nickerson's request before and after the inspection of the M/V MARY ANNE. The course of business dealings between parties is indeed competent evidence when proving the existence and object of an oral contract. See James M. Vardaman & Company, Inc. v. Ponder, 443 So.2d 697, 698 (La.App. 1st Cir.1983), writ denied, 446 So.2d 317 (La.1984). However, given the marked variances in the type and language of the paperwork submitted for other vessels, as well as the parties' inconsistent testimony attempting to explain the variances, we find this evidence does not support one party's case any more than the other.
Following a thorough review of the record, we conclude there is ample evidence to support the trial court's conclusion that IC Insurance carried its burden of proving an oral contract between PKB and Incitec for a hold cleanliness inspection of the M/V MARY ANNE's Hold Number 3. After reading and hearing the witnesses' testimony, the trial court noted the obvious inconsistencies regarding the object of the contract. When evaluating the evidence needed to establish the contract, the trial court is allowed to make credibility determinations. See Smith v. Dishman & Bennett Specialty Company, Inc., 35,682 (La.App. 2nd Cir.1/23/02), 805 So.2d 1220, 1225; Ball v. Perkins College Partnership in Commendam, 572 So.2d 1118, 1123 (La.App. 1st Cir.1990).
The trial court apparently determined Mr. Nickerson's testimony that Incitec hired PKB to perform a hold cleanliness inspection of the M/V MARY ANNE, corroborated by the fact that Captain Sedek performed such an inspection and issued a certificate indicating so, was more credible than the testimony of Captains Ramos and Kahn and other evidence in the record indicating that Incitec only contracted for a cargo inspection of the M/V MARY ANNE. We find no clear error in our review of these factual conclusions and agree there is sufficient evidence to establish Incitec's oral contract with PKB to perform a hold cleanliness inspection of the M/V MARY ANNE. See Pennington Construction, Inc., 652 So.2d at 639; Percy, 468 So.2d at 818. This assignment of error is without merit.

PKB'S Breach of the Contract
In assignment of error number two, PKB contends the trial court erred in finding PKB breached the contract.
An obligor is liable for the damages caused by his failure to perform a contract. A failure to perform results from nonperformance, defective performance, or delay in performance. La. C.C. art. 1994. In reasons for judgment, the trial court determined PKB breached its contract with Incitec, because it was hired to inspect Hold Number 3 of the M/V MARY ANNE for cleanliness, it certified to Incitec that the hold was in fact "clean, dry, and [did] not contain any foreign materials and [was] suitable for loading fertilizer cargo," but the hold was in fact not clean and free from contaminants. Thus, the trial court determined PKB rendered a defective performance of the contract.
In contract cases, whether the defendant has properly performed his obligation is a question of fact. Rogers v. Price, 29,721 (La.App. 2nd Cir.8/20/97), 698 So.2d 723, 726, writ not considered, 97-2406 (La.12/12/97), 704 So.2d 1180; Rye v. Terminix Service Company, Inc., 423 So.2d 754, 756 (La.App. 4th Cir.1982). And, on appeal, factual determinations are subject to the manifest error standard of review. If there is a reasonable basis in *94 the record to support the trial court's factual conclusions, manifest error does not exist. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882-883 (La.1993).
In his testimony, Captain Sedek described the steps he took in performing the hold cleanliness inspection of Hold Number 3. As earlier mentioned, Captain Sedek had no specific recollection of the M/V MARY ANNE inspection but testified as to what he typically did when inspecting a hold. In the case of the M/V MARY ANNE, Captain Sedek used a flashlight because the inspection was done shortly after midnight.[10] He would first check the culverts, head covers, hatches, and head combings from the deck of the vessel. Then, he would go down into the hold via a ladder, looking at all visible surfaces as he descended, including any braces, beams, or structures on the interior of the hold. Once standing on the floor of the hold, Captain Sedek would check the floor, the slots, the bulkheads, the sides, the overheads, and the underside of the deck.
Captain Sedek admitted that not all areas within a hold are visible when doing a cleanliness inspection. He stated that if the visible areas of a hold are clean, it can be assumed that the non-visible areas are likewise clean. He further stated that the presence of as little as seventeen sunflower seeds, or as many as twenty small styrofoam cups of sunflower seeds, could possibly go undetected in a hold cleanliness inspection, especially if the seeds were resting on overhead beams. Further, witnesses for both PKB and Incitec generally attested that, depending on a ship hold's structure, small amounts of a contaminant such as sunflower seeds can go undetected in a hold cleanliness inspection.
The above evidence demonstrates how easily a small amount of contaminant could be overlooked in a proper hold cleanliness inspection. However, the trial court had to reconcile this evidence with other evidence in the record indicating the amount of contaminant in this case was not small. The record contains conflicting evidence regarding the amount of sunflower seeds found in the DAP unloaded from Hold Number 3 of the M/V MARY ANNE. PKB contends that only seventeen sunflower seeds were found in the approximate eight hundred metric tons of DAP at issue, relying on a report issued by S.G. Webb & Co., a marine survey company hired by Incitec to inspect the DAP stockpile after the sunflower seed contamination was found. However, Alexander Henderson, the S.G. Webb & Co. marine surveyor who performed the inspection, explained in his deposition that the seventeen seeds were found after a fifteen minute search that was limited to the working face of the DAP stockpile. He clarified that his report was not meant to imply that there were only seventeen sunflower seeds in the entire stockpile.
Ross Brittliff, the Incitec employee who discovered the contamination, testified that seeds were found "scattered through[out] the heap." He stated that at least twenty styrofoam coffee cups full of sunflower seeds were removed from the stockpile after the contamination was discovered, and more seeds remained in the stockpile after that. Mr. Anthony Piggott, a New South Wales Agriculture employee who also inspected the DAP stockpile after the contamination was discovered, testified *95 by deposition that he examined the pile from top to bottom and found that it was contaminated throughout with sunflower seeds. He did not count the number of seeds he found, because he found them in every area he looked.
The trial court was presented with much evidence regarding the extent of Captain Sedek's inspection, how a proper hold cleanliness inspection was performed, and the amount of sunflower seed contamination found in the DAP unloaded from Hold Number 3. The trial court obviously accepted as fact that there was significant contamination of the DAP stockpile at issue and that the seeds should have been discovered in a proper hold cleanliness inspection. After considering this evidence, the trial court determined PKB did not properly perform its contractual obligation to Incitec. After a thorough review of the record, we find the record supports this conclusion and it is not manifestly erroneous. See Rogers, 698 So.2d at 726; Rye, 423 So.2d at 756-757.

Limitation of Liability Clause
In assignment of error number three, PKB contends the trial court erred in finding that a limitation of liability clause in its loading certificate did not apply to limit its liability to Incitec. The clause at issue appears on the last page of the "Inspection, Loading and Sampling Certificate" PKB issued to Incitec after the inspection of the M/V MARY ANNE and reads, "This inspection has been carried out to the best of our knowledge and ability and this certificate does not cover any damage to the material after loaded to the vessel." (Emphasis added.) According to PKB, this clause excludes their liability to Incitec for the DAP contamination.
In reasons for judgment, the trial court stated "[t]o interpret the contract in the method suggested by PKB would not be a limitation of liability, it would be an obliteration of liability[,] for a contamination of this nature would never occur until the cargo was in the hold." Assuming, but not deciding, that the limitation of liability clause was part of the contract between PKB and Incitec, we conclude the trial court properly interpreted the clause to find PKB liable under the facts of this case.
To determine the meaning of words used in a contract, a court should give them their generally prevailing meaning. La. C.C. art. 2047. If a word is susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048; Sanders v. Silverthorn, 2003-2726 (La.App. 1st Cir. 2/11/05), 906 So.2d 518, 522, writ denied, XXXX-XXXX (La.4/29/05), 901 So.2d 1076; Claitor v. Delahoussaye, XXXX-XXXX (La.App. 1st Cir.5/28/03), 858 So.2d 469, 478, writ denied, XXXX-XXXX (La.10/17/03), 855 So.2d 764. In this case, the word "after" in the limitation of liability clause is susceptible to different meanings. PKB would have us interpret "after" to exclude its liability for contamination caused by conditions that existed before the DAP was loaded into Hold Number 3, but which contaminated the DAP after it was loaded. In that case, because the sunflower seeds were in the hold before the DAP was loaded, and because the DAP became contaminated after it was loaded in the hold and came into contact with the sunflower seeds, then PKB would not be liable. On the other hand, "after" could also be construed to limit PKB's liability only to contamination caused by conditions that arose after it was loaded into Hold Number 3. In that case, PKB's liability would include contamination caused by conditions that existed before the DAP was loaded (i.e., the sunflower seeds were in the hold when *96 the DAP was loaded), but would not include contamination caused by conditions that arose after the DAP was loaded (e.g., sunflower seeds were thrown into the DAP after loading was complete).
Earlier in this opinion, we affirmed the trial court's finding that the object of the contract between PKB and Incitec was PKB's performance of a hold cleanliness inspection to assure Incitec that the ship hold into which the DAP was to be loaded was clean, dry, and contained no foreign matter. We agree with the trial court that to interpret the limitation of liability clause as suggested by PKB would negate the very duty PKB had to assure that the ship hold was clean, dry, and contained no foreign matter. Therefore, given the object of the contract between the parties, we conclude that PKB was liable for the sunflower seed contamination of the DAP, because the condition that caused the contamination, the presence of the seeds, existed before the DAP was loaded into Hold Number 3. Had the sunflower seeds been added to the hold after the loading of the DAP, PKB would not have been liable. This assignment of error is without merit.

LACHES
In assignment of error number four, PKB contends the trial court erred in finding that IC Insurance's claim against PKB was not barred by laches. The parties agree that the contract between them was a maritime contract governed by the doctrine of laches.[11] The doctrine determines whether a party's delay in bringing its claim should bar the suit. Azalea Fleet, Inc. v. Dreyfus Supply and Machinery Corporation, 782 F.2d 1455, 1458 (8th Cir.1986). Laches will bar a claim when there has been an inexcusable delay in asserting a right or claim and undue prejudice to the party against whom the claim is asserted. Venus Lines Agency, Inc. v. CVG International America, Inc., 234 F.3d 1225, 1230 (11th Cir.2000). In maritime cases, courts look to the analogous statute of limitations, or prescriptive period, as a benchmark to determine when to apply the doctrine of laches. Id. The analogy rule serves primarily to determine which party bears the burden of proof. When a plaintiff files a maritime claim within the analogous statutory period, the defendant must show inexcusable delay and resulting prejudice to establish a laches defense. Barrois v. Nelda Faye, Inc., 597 F.2d 881, 885 (5th Cir.1979). Because this case involves an action on a contract, the analogous prescriptive period under Louisiana law is the ten-year prescriptive period for personal actions found in La. C.C. art. 3499. Roger v. Dufrene, 613 So.2d 947, 948 (La.1993). A trial court has considerable discretion in deciding whether to apply the doctrine of laches to claims pending before it. National Association of Government Employees v. City Public Service Board of San Antonio, Texas, 40 F.3d 698, 707 (5th Cir.1994).
IC Insurance filed suit against PKB less than three years after the contaminated DAP was discovered and approximately one and one-half years after having paid Incitec's insurance claim  clearly within the analogous prescriptive period applicable to this case. Thus, PKB *97 had the burden of showing inexcusable delay and resulting prejudice to establish a laches defense. Barrois, 597 F.2d at 885. We find no inexcusable delay. Despite IC Insurance's delay in filing suit, PKB had notice of the potential claim as early as October 1991, when Mr. Nickerson sent PKB a letter advising of its potential liability for Incitec's losses associated with the contaminated DAP.[12] Thus, PKB had notice of the potential claim within less than one year after the contamination occurred and within two months of Incitec's discovery of the contamination. PKB, an experienced marine surveying entity aware of the gravity of faulty hold cleanliness inspections, had ample time to take whatever action it deemed necessary to protect its interests in this case. See International Ore & Fertilizer Corporation v. SGS Control Services, Inc., 38 F.3d 1279, 1285 (2nd Cir.1994), cert. denied, 515 U.S. 1122, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995) (noting that a professional hold inspection company that issued formal certificates essential to maritime commerce was "fully aware that a negligent inspection may cause the loss of an entire cargo.")
Having found no inexcusable delay, we need not address the prejudice prong of the doctrine of laches. After a thorough review, we conclude the trial court did not abuse its discretion by finding the doctrine of laches was not applicable in this case. This assignment of error is without merit.

PREJUDGMENT INTEREST
As earlier noted, the trial court initially signed a judgment against PKB on July 9, 2003, bearing interest from April 3, 1992, the date IC Insurance paid Incitec's insurance claim, until paid, at the judicial rates imposed by Louisiana law, compounded daily. The trial court later granted PKB's motion for new trial on the issue of prejudgment interest. On September 17, 2004, the trial court signed another judgment, wherein it ruled on the motion for new trial. In that judgment, the trial court awarded the same amount on the principal demand against PKB; it amended the judgment, however, to allow interest to run from April 3, 1992 (the date IC Insurance paid Incitec's insurance claim) to August 12, 2002 (the date the trial court's reasons for judgment for the first judgment were filed); to suspend the accrual of interest from August 12, 2002, until September 17, 2004 (the date the trial court signed the second judgment); and to reinstitute the accrual of interest as of September 17, 2004. The interest was imposed at the judicial rates imposed by Louisiana law, compounded annually.
In assignment of error number five, PKB contends the trial court abused its discretion in awarding IC Insurance prejudgment interest. PKB contends that its liability in this case was not determined until more than ten years after IC Insurance paid Incitec's insurance claim. According to PKB, the cause of the ten-year delay was IC Insurance's failure to timely prosecute its suit and the trial court's delay in entering judgment. PKB contends this court should reverse the entire award of prejudgment interest or should conclude that interest is not owed until August 12, 2002, the date the trial court determined PKB's liability.
The parties agree that courts generally award prejudgment interest in maritime cases and that the interest generally runs from the date of loss. See Koch Refining Company v. Jennifer L. *98 Boudreaux M/V, 85 F.3d 1178, 1183 (5th Cir.1996); Reeled Tubing, Inc. v. M/V Chad G, 794 F.2d 1026, 1028 (5th Cir. 1986). However, such an award is not automatic, and courts may exercise their discretion to deny prejudgment interest when "peculiar" or "exceptional" circumstances would make it inequitable for the losing party to be forced to pay prejudgment interest. City of Milwaukee v. Cement Division, National Gypsum Company, 515 U.S. 189, 195, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995); Koch Refining Company, 85 F.3d at 1183. We review the trial court's award of prejudgment interest under the abuse of discretion standard of review. Id.
In this case, IC Insurance's cause of action against PKB arose in April 1992, when it paid Incitec's claim and became subrogated to Incitec's rights against PKB. The final judgment in this case was not signed until September 17, 2004, over twelve years later. Without setting forth the details here, our review of the record indicates that this prolonged delay was due to several circumstances, including: the delay in Incitec's discovery of the contamination; the time required for Incitec to settle its insurance claim with IC Insurance; IC Insurance's delay in filing suit against PKB; the delay caused by pre-trial resolution of claims PKB brought against third parties; the trial court's continuance of the trial date on its own motion; the trial court's order allowing the parties to submit post-trial depositions; a delay in the filing of post-trial depositions and post-trial memoranda; IC Insurance's objection to introduction of post-trial depositions; disagreement between the parties as to computations in the proposed judgment; and the trial court's delay in rendering its first judgment.
Given the unique posture of this case, we determine the trial court's award of prejudgment interest herein did not constitute an abuse of discretion. We note the trial court modified the interest award in the September 17, 2004 judgment for its delay in rendering judgment. Most of the remaining delay caused by the above circumstances is not attributable to a lack of diligence in reaching a resolution of this case. These circumstances certainly are not of the "peculiar" or "extraordinary" type that would make it inequitable for PKB to pay prejudgment interest in this case. This assignment of error is without merit.

CONCLUSION
For reasons set forth in this opinion, we affirm the trial court's September 17, 2004 judgment in favor of Imperial Chemicals Insurance Limited and against PKB Scania (USA), Inc. and Inchcape Testing Services, Inc., in the principal amount of $251,400.70 (Australian). The judgment is to bear judicial interest at rates imposed by Louisiana law, compounded annually, from April 3, 1992, to August 12, 2002. Interest is suspended from August 13, 2002, to September 17, 2004, and commences to run again from September 18, 2004, until paid.
Costs of this appeal are to be borne equally by the parties.
AFFIRMED.
McCLENDON, J., dissents in part and assigns reasons.
McCLENDON, J., dissents in part.
While I agree with the majority opinion that affirms PKB's liability, I believe that this matter clearly involves "peculiar" and "exceptional" circumstances, to the extent that it is inequitable to force PKB to pay prejudgment interest. It took more than thirteen years from the discovery of the contamination and more than twelve years *99 from the payment of Incitec's claim to render a judgment against PKB. Based on the facts of this case, it was an abuse of discretion to cast PKB in judgment for prejudgment interest, even with the modification made by the trial court. Therefore, I respectfully dissent on that issue. In all other respects, I agree with the majority.
NOTES
[1] The "hold" of a ship is the compartment into which cargo is loaded.
[2] Captain Johannes Joensen, the M/V MARY ANNE's ship captain, testified by deposition that before arriving in Donaldsonville, the M/V MARY ANNE had transported sunflower seeds in Holds 1, 2, 3, 4, and 5 from Argentina to Mexico; had then sailed to Tampa, Florida, where DAP and/or MAP (presumably another fertilizer) was loaded into Holds Number 1, 2, 4, and 5; and had then sailed to Donaldsonville to receive the load of DAP into Hold Number 3.
[3] Incitec sold part of the DAP from Hold Number 3 before the sunflower seed contamination was discovered. The amount of DAP sold to Farmix Fertilizers Corporation was approximately 800 metric tons of the original 4,200 metric tons loaded in Donaldsonville.
[4] On October 15, 1993, Incitec issued an "Acknowledgment of Authority" to IC Insurance authorizing it to pursue any action or proceedings related to the claim for the contaminated DAP.
[5] Using a conversion rate of $.7763 (Australian) to $1.00 (United States), the judgment in United States dollars was $195,162.36.
[6] PKB's argument is based on La. C.C. art. 2046, which provides, "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." See Chailland Business Consultants v. Duplantis, 2003-2508, 2003-2509 (La.App. 1st Cir.10/29/04), 897 So.2d 117, 123, writ denied, 2004-2922 (La.2/4/05), 893 So.2d 878.
[7] Even if Mr. Nickerson were acting as Incitec's agent at the same time he was acting as Top Australia's agent, the referenced documents would not bind Incitec, because Incitec is not a party to the contract allegedly formed by the documents.
[8] PKB's invoice to Incitec shows the value of the contract between PKB and Incitec for the inspection of the M/V MARY ANNE was $921.26 (United States).
[9] In brief, PKB argues the trial court erred in relying on Captain Sedek's testimony to establish the existence of a hold cleanliness inspection contract between PKB and Incitec, because Captain Sedek did not have the capacity to contract on behalf of PKB. Regardless of whether Captain Sedek had the capacity to contract of behalf of PKB, the trial court reasonably relied on his testimony as corroborating evidence that PKB and Incitec contracted for a hold cleanliness inspection through their authorized representatives, Mr. Nickerson and Captain Ramos. As noted above, an oral contract can be proved by the testimony of one witness and "other corroborating circumstances." La. C.C. art. 1846. The corroborating evidence can be in the form of a second witness' testimony. Trans-Global Alloy Limited v. First National Bank of Jefferson Parish, 583 So.2d 443, 451 (La. 1991).
[10] Captain Sedek testified that the majority of hold cleanliness inspections are performed in daylight hours but that it is not unusual for them to be performed in the dark. Captain Johannes Joensen, the M/V MARY ANNE's ship captain, testified by deposition that nighttime hold cleanliness inspections were not unusual.
[11] In the recent case of Fishbein v. State. of Louisiana Through Louisiana State University Health Sciences Center, 2004-2482 (La.4/12/05), 898 So.2d 1260, 1270, the supreme court indicated the doctrine of laches has no place in Louisiana's system of civil law. However, when a claim is cognizable under admiralty law, the federal substantive maritime law, including the doctrine of laches, applies. McCraine v. Hondo Boats, Inc., 399 So.2d 163, 165 (La.1981), cert. denied, 458 U.S. 1105, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982).
[12] Although PKB denied receiving this letter, the trial court made the factual determination that PKB did in fact receive the letter. There is ample evidence in the record to support this conclusion.