800 So.2d 11 (2001)
Cleveland G. TOWNSEND
v.
Steven H. URIE.
No. 2000 CA 0730.
Court of Appeal of Louisiana, First Circuit.
May 11, 2001.
Writ Denied September 21, 2001.
*12 Michael D. Ferachi, Baton Rouge, for Plaintiff/Appellee, Cleveland G. Townsend.
Jack M. Dampf, Baton Rouge, for Defendant/Appellant, Steven H. Urie.
Before: CARTER, C.J., WEIMER, and KLINE,[1] JJ.
CARTER, Chief Judge.
This appeal addresses the propriety of a trial court's judgment ordering defendant, Steven H. Urie, to pay plaintiff, Cleveland G. Townsend, the bonus Townsend had *13 been promised for his work on behalf of Jazz Enterprises, Inc. (Jazz Enterprises). Urie appeals the trial court's judgment ordering him to pay Townsend the bonus as set forth in the judgment. Townsend answered the appeal arguing that the trial court erroneously considered a credit on Urie's behalf and that Townsend's award should be higher.

BACKGROUND
Cleveland G. Townsend was the business operations manager for IBM Nevada until August 1992, when he accepted a job with Lodging and Gaming Systems in Reno, Nevada. Steven H. Urie owned Lodging and Gaming Systems. There was never a written contract of Townsend's terms of employment, but Urie informed him that he would be eligible for subjective bonuses based on his performance. Included in these subjective bonuses was the possibility that Townsend could be granted equity ownership in Lodging and Gaming Systems.
In approximately December 1992, Urie assigned Townsend to work on a project involving one of his other businesses, Jazz Enterprises. Urie was the chairman of the board and majority shareholder of Jazz Enterprises.[2] The purpose of Jazz Enterprises was to develop a riverboat gaming establishment in Baton Rouge, Louisiana, in the Catfish Town area.
Townsend's employment was transferred to Jazz Enterprises and he began undertaking the necessary assignments to complete the applications for a gaming license with the Louisiana Riverboat Gaming Commission and the Louisiana State Police. Throughout 1993 and 1994, Townsend commuted from his home in Reno to Baton Rouge in order to oversee construction of the Catfish Town project, meet with members of the Louisiana Riverboat Gaming Commission, interview potential operators of the riverboat casino, and market the project to officials of the City of Baton Rouge, and other community leaders.
In July 1994, Jazz Enterprises was granted definitive approval of its gaming license. Townsend decided to move his family from Reno to Baton Rouge. According to Townsend, Urie told him on several occasions he would be compensated with an equity position in Jazz Enterprises because of his work on the Catfish Town project. However, like the prior arrangement with Lodging and Gaming Systems, there was never any written agreement regarding the terms of Townsend's employment or bonus schedule with Jazz Enterprises.
In December 1994, the shareholders of Jazz Enterprises, Urie, Johnson and Bradley, decided to sell their stock to Argosy Gaming Company (Argosy). The sale price of the stock buyout was $28 million to be paid over a twenty-year span. The sale would consist of an initial cash payment of $8.5 million; a promissory note of $13.5 million, to be paid quarterly over ten years; and $5 million, to be paid out quarterly over the following ten years. The sale of the stock was completed in June 1995.
Once the shareholders of Jazz Enterprises made the decision to sell their stock, most of the employees were offered either six months salary or a job with one of Urie's other companies in Reno, Nevada. Townsend was not made such an offer, but instead proceeded to work on the due diligence matters necessary for completion of the sale and other matters for Urie. Urie *14 told Townsend that since he could no longer grant him an equity interest in Jazz Enterprises, Townsend would receive a cash bonus commensurate with what his equity ownership would be worth after the sale was completed.
In September 1995, a meeting took place in Reno between the shareholders of Jazz Enterprises, Townsend, and two individuals who were also being compensated for their work on the Catfish Town project, Nancy Smith and Peter Wiliday. At this meeting, Townsend was again assured he would be receiving a bonus over and above his salary for his work on the Catfish Town project. However, contrary to the assertions previously made by Urie, Townsend only received a $10,000.00 bonus.

FACTS
Sometime in April 1997, Urie, Townsend, and Bradley met for dinner at a restaurant in Baton Rouge. The events of this meeting formed the catalyst for the present dispute. According to Townsend, Urie offered and he accepted, a bonus for his work on the Catfish Town project that would be equal to the amount of money Bradley was due to receive as a 5% shareholder of Jazz Enterprises. According to Urie, he offered Townsend 5% of the proceeds of the sale as he received them from Argosy. In other words, Urie made a net offer of 5% of whatever he received from Argosy. However, Urie contends Townsend never accepted this offer.
After the April meeting, Townsend became aware that Urie was attempting to sell or borrow against his share of the note to repay some of the debts of Jazz Enterprises. Becoming fearful that this action would jeopardize his receiving anything, Townsend hired an attorney and sent Urie a demand letter seeking 5% of the total proceeds of the sale.
In response to the demand letter, Urie offered Townsend the option of accepting either $5,000.00 in cash or 5% of the proceeds from future Argosy payments. Townsend responded by faxing Urie an acceptance of his offer of 5% of the proceeds from future Argosy payments. Townsend's acceptance was dated July 8, 1997.
On July 14, 1997, Urie sent Townsend a letter providing an update regarding when he could expect to begin receiving payments. Urie's letter specifically provided, "I will commit to pay you five percent of the net proceeds that are paid to me as they are received from Argosy." The record does not indicate any action or response from Townsend to Urie's letter of July 14, 1997.
By letter dated December 11, 1997, Urie notified the former shareholders of Jazz Enterprises and others who would be receiving a bonus of the status of the payments and when they could expect to receive payments. The letter indicated that Townsend's interest should become positive in the first or second quarter of 1999. The reason it would be another year before Townsend would receive any payment was that Urie was using his share of the proceeds to pay off some of the debts of Jazz Enterprises.
Townsend responded to Urie's update by a letter dated December 15, 1997, asserting that although Urie's offer of July 14, 1997 was for "5% of the net proceeds," Townsend considered the compensation owed to him as an obligation of the partnership that should be paid out from the gross amount. Townsend also indicated that he would be willing to accept $180,000.00 in a lump sum in lieu of taking legal action to recover the bonus that had been promised. The record does not reflect any response to Townsend's letter of December 15, 1997.
*15 On January 29, 1998, Townsend filed a Rule to Show Cause naming Urie as defendant. The rule alleged Urie violated LSA-R.S. 23:631B by not giving Townsend the full extent of his compensation.[3] On April 14, 1998, Townsend amended the rule and converted the matter to an ordinary proceeding, alleging that Urie was liable to him for 5% of all amounts paid and due to Urie by Argosy from the purchase of stock of Jazz Enterprises by Argosy, less the $10,000.00 bonus previously paid. The petition for damages did not allege any violations of LSA-R.S. 23:631B.
On October 25, 1999, the matter was heard in a bench trial. The evidence consisted of the testimony of Townsend, Bradley, and Urie. A series of letters between Urie and Townsend and other documentary evidence related to the sale of the Jazz Enterprises stock were also introduced into the record. After the hearing, the trial court found that there was an enforceable agreement between Townsend and Urie and ordered Urie to pay Townsend according to the following schedule:
1. A payment of $10,125.00 to Townsend before March 30, 2000.
2. Payments of $12,656.25 to be made each calendar quarter beginning June 30, 2000 through June 30, 2005.
3. Payments of $4,687.50 to be made each calendar quarter from September 30, 2005 through June 30, 2015.
Urie appeals the judgment of the trial court alleging that the trial court erred in finding there was a completed contract when Townsend did not accept the offer, but made a counter-offer. Urie also alleges that the trial court erred in conforming Townsend's counter-offer to match Urie's original offer.
Townsend answered the appeal and asserts the trial court improperly ruled that the amount owed by Urie was subject to a credit of 5% of 75% of $3 million.[4] Townsend argues the amount he should receive should be the same amount received by Mark Bradley, a 5% owner of Jazz Enterprises.[5]

DISCUSSION
Resolution of the present matter turns on the determination of two separate issues. The first issue is whether Urie's bonus offer was an offer of 5% of the total proceeds of the stock sale (a gross arrangement) or for an arrangement of 5% of whatever would be received by Urie after certain debts of the shareholders were deducted from Urie's share (a net arrangement). The second issue to be resolved is whether Townsend accepted Urie's offer. In reaching these determinations, we are guided by the jurisprudential tenet that the existence or nonexistence of a contract is a question of fact. Fox v. LAM, 25,616, p. 2 (La.App. 2nd Cir.2/23/94), 632 So.2d 877, 878. A reviewing court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart *16 v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.

What was Urie's offer?
In reviewing the record we find that although Urie contends Townsend never accepted his offer of a bonus, the precise nature of the offer was that Townsend would get 5% of the net proceeds as Urie received them from Argosy. On cross-examination during the trial of this matter, Urie explained that he would give Townsend 5% of his net proceeds as he received them from Argosy. Urie was not the sole owner of Jazz Enterprises, rather he only owned 75% of the shares.
According to Urie's trial testimony, he had agreed to pay all of the debts of the former shareholders of Jazz Enterprises from his share of the sale proceeds. Argosy had offset roughly $3 million from the sale proceeds for the debts of Jazz Enterprises. Since Johnson and Bradley were not paying any of the debts of Jazz Enterprises, their quarterly payments began in 1998; however, at that time Urie had not begun to receive his share of the proceeds.
Townsend maintains that Urie's offer was for 5% of the total proceeds of the sale, before any debts were subtracted. Townsend testified that at the April 1997 dinner meeting, Urie told him he would be "on par" with Bradley and would receive the same amount as Bradley would receive from the sale. Bradley, who was present at the April 1997 dinner, testified that it was his impression that Townsend was to receive the equivalent of what he was going to receive in the proceeds from the sale of Jazz Enterprises.
A close examination of the record reveals that in addition to Urie's testimony, Townsend's testimony and the letters between the parties support the trial court's conclusion that Urie's bonus offer was for Townsend to receive a 5% net arrangement from Urie's share of the proceeds. First, Townsend's own testimony indicates his understanding of the offer made by Urie in April 1997 was that "[Urie] was going to pay me five percent of the proceeds as he received them from Jazz or from Argosy." (emphasis added). When asked where he thought the 5% would come from, Townsend responded that his 5% was going to come from "[Urie's] 75%."
Later in his testimony, Townsend stated that he thought his share would be equal to the 5% received by Bradley, who was a 5% equity owner of Jazz Enterprises. However, we note for Urie to have given Townsend a 5% total share in the proceeds, he would have had to give Townsend more than 5% of his own share. Nowhere in the record does any witness or document reflect Urie was going to give Townsend an amount greater than 5% of his own share. Nor did Urie ever indicate an exact figure that Townsend's bonus would be, thereby making it reasonable for the trial court to conclude that an exact dollar figure could not be determined until certain debts were paid from Urie's share of the proceeds.
We also find Urie's letter to Townsend dated July 14, 1997, was indicative of the exact nature of his offer. The letter stated in part:
Depending on the final resolution of how much we pay for the Palazzotto payoff, Argosy payments should begin third or fourth quarter of next year. As consideration for your contribution to Jazz during my ownership and as separation compensation from Jazz Investments, I will commit to pay to you five percent of *17 the net proceeds that are paid to me as they are received from Argosy. (emphasis added).
Clearly, the language used in Urie's July 14, 1997 letter contemplates that Townsend's bonus would be derived from Urie's net proceeds from the sale. Although Townsend and Bradley both testified that Urie's offer was to provide Townsend with the same payments received by Bradley, we find the trial court's choice between these two versions of the offer was not manifestly erroneous. See Stobart, 617 So.2d at 883. Accordingly, we find that Urie's bonus offer to Townsend was for 5% of the net proceeds of Urie's 75% as he received them from Argosy.

Did Townsend accept Urie's offer?
Consent to an agreement may be oral, written, by action, or even inaction when such inaction is under circumstances as would clearly indicate consent. LSA-C.C. art. 1927. A trial court is given discretion to determine if consent may be implied from the particular circumstances of the case. Illinois Central Railroad Company v. International Harvester Company, 368 So.2d 1009, 1011-12 (La.1979).
Urie testified he did not remember if Townsend accepted his bonus offer at the April 1997 dinner. However, Townsend and Bradley both testified that Townsend did accept Urie's bonus offer at that time. Urie also testified that Townsend rejected the offer contained in his July 14, 1997 letter because Townsend wanted a different arrangement. A close examination of the record reveals that although Urie contends his offer was never accepted, there is ample evidence in the record to support the trial court's conclusion that Townsend did accept the offer of the bonus.
Initially, we note that if Townsend had not accepted Urie's offer at the April 1997 dinner, he would have no cause for concern that Urie was using his share of the proceeds to pay off debts. Following the July 2, 1997 demand letter sent by Townsend's attorney, Urie responded with a phone call explaining the delay in payment schedules and an offer of $50,000.00 in cash or 5% of the proceeds as he received them from Argosy. Townsend responded with a fax sent July 8, 1997, accepting Urie's offer. Following this acceptance, Urie sent Townsend updates on when he could expect payment in letters dated July 14, 1997, and December 11, 1997. Although Townsend disputes the July 14, 1997 letter represented their agreement, he did not respond to this letter. Under the circumstances, we find it was reasonable for the trial court to conclude that Townsend had accepted the bonus as detailed in Urie's July 14, 1997 letter.

Townsend's December 15, 1997 letter was not a counter-offer.
Urie contends that Townsend's letter dated December 15, 1997, was a counter-offer to his bonus offer and indicates Townsend never accepted the offer of a bonus. We disagree. Urie's offer and Townsend's acceptance of the bonus created a gratuitous contract. A contract is gratuitous when one party obligates himself toward another for the benefit of the latter, without obtaining any advantage in return. LSA-C.C. art. 1910. Indeed, if a party offers to do something gratuitously and the other party accepts, the result is a very simple unilateral and gratuitous contract that is perfectly enforceable since the existence of a lawful cause is always presumed. See Saul Litvinoff, Still Another Look at Cause, 48 La. L.Rev. 3, 19-20 (1987).
*18 If a contract is gratuitous, the cause is the mere generosity or liberality of the giver.[6] Urie's offer of a bonus stemmed from his desire to reward Townsend, in addition to the salary Townsend received, for his efforts on the Catfish Town project. Under the circumstances of this case we find that Townsend's December 15, 1997 letter did not contain a counter-offer, but more of something in the nature of a compromise not to pursue legal action in lieu of enforcing the existing unilateral gratuitous contract. Moreover, under the particular facts of this case, we find Townsend could not make a true counter-offer to Urie's offer of a bonus, because the cause of the contract was Urie's generosity and desire to reward Townsend. A counter-offer by Townsend would lack the same cause.
After our review of the record, we agree with the trial court's implied finding that Townsend's December 15, 1997 letter was not a counter-offer. The letter should not relieve Urie of his obligation of paying the bonus. Rather, the December 15, 1997 letter merely indicated Townsend's frustration with the delays he was encountering in enforcing the agreement that he and Urie had perfected.

CONCLUSION
Based on our review of the record, we cannot say the trial court's order for Urie to pay Townsend the bonus as per the schedule set forth in the trial court judgment was erroneous. Accordingly, the judgment of the trial court is affirmed. All costs of the appeal are assessed equally to Cleveland G. Townsend and Steven H. Urie.
AFFIRMED.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Urie owned 75% of Jazz Enterprises while the remaining shares were owned by Ron Johnson (20%) and Mark Bradley (5%). Mark Bradley also served as vice-president of operations for Jazz Enterprises.
[3] LSA-R.S. 23:631B provides:

In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have the right to file an action to enforce such a wage claim and proceed pursuant to Code of Civil Procedure Article 2592.
[4] The record reflects that Urie paid $3 million of the debts of Jazz Enterprises from his share of the proceeds. Some of the other debts of Jazz Enterprises were also subtracted from his share.
[5] As a recipient of 5% of the sale proceeds, Bradley is scheduled to receive $16,875.00 per quarter for the first time period and $6,250.00 per quarter for the second time period.
[6] This statement can be found in Puerto Rico: A Mixed Legal System Emergence of New Legal Creations, 32 Rev. Jur. U.I.P.R. 291, 295 (1998). Although the article addresses certain provisions of the Civil Code of Puerto Rico, we find this statement accurately reflects what is the cause of a gratuitous contract under the Louisiana Civil Code as well, as reflected in LSA-C.C. art. 1910.