HIGGINBOTHAM, J.
1 gThis action involves a dispute over the conversion of business assets. The appeal challenges a $601,380.00 damage award in a judgment rendered September 7, 2012, pursuant to a jury verdict. The verdict was in favor of Commercial Flooring and Mini Blinds, Inc. (CFMB-Inc.) and Commercial Flooring and Mini Blinds of Baton Rouge, L.L.C. (CFMB-BR), collectively referred to as the plaintiffs, and against Stephen Keith Edenfleld (Keith) and Commercial Flooring of Baton Rouge, L.L.C. (CF-BR), collectively referred to as the defendants. The amount awarded by the jury represented compensation to the plaintiffs for the defendants’ wrongful conversion of CFMB-Inc.’s one-half interest in the assets of CFMB-BR. The judgment dismissed the plaintiffs’ conversion claim against a third defendant, Marshall Kyle Edenfleld (Kyle). The defendants moved for a new trial, or in the alternative, remittitur, and a judgment notwithstanding the verdict. The trial court denied all of the defendants’ post-trial motions; this appeal followed. For the outlined reasons, we amend the judgment in part, and as amended, we affirm.
FACTS AND PROCEDURAL HISTORY
In 1996, Patrick J. Rooney (Pat) acquired the assets of a flooring business in the New Orleans area and he formed a new business known as CFMB-Inc. As the business grew and thrived, CFMB-Inc. expanded into Baton Rouge. Pat hired Keith Edenfleld to manage the Baton Rouge location. In 1999, Pat and Keith decided to become business partners when they formally created a new limited liability company (L.L.C.) for the Baton Rouge operation, which they called CFMB-BR. Keith and CFMB-Inc. each owned a 50% membership interest in the *34 new L.L.C. The Baton Rouge business continued to grow and expand with different locations doing business as Floor-scapes at one location and Flooring Depot U.S.A. at another location.
|sOn October 1, 2004, Pat and Keith formed yet another L.L.C. called Roonfield Properties, L.L.C. (Roonfield), in order to purchase property and a building located on Airline Highway in Baton Rouge. Keith and Pat (not CFMB-Inc.) each owned a 50% membership interest in Roonfield. Roonfield then leased the property/building to CFMB-BR under a verbal agreement so that CFMB-BR could operate its Baton Rouge businesses, Flooring Depot U.S.A. and Floorscapes, at the Airline property location. Keith managed CFMB-BR with the help of his brother, Kyle, and Pat received a monthly salary and benefits for his role as a partner in the business.
Following Hurricane Katrina in 2005, Pat decided to sell his New Orleans business operation, CFMB-Inc. to his son, Christian Rooney, who had formed his own business, Commercial Flooring Gulf Coast, L.L.C. (CF-GC), in 2006. However, the sale of CFMB-Inc.’s New Orleans operations specifically excluded and did not affect CFMB-Inc.’s membership interest in CFMB-BR. It was somewhere at that point in time that Pat and Keith began to engage in informal discussions about the possible sale of the Baton Rouge business operations.
In 2006, Pat and Keith offered to sell Roonfield to another flooring business for $2.1 million, so that each of them would clear $500,000.00 after the Roonfield property debt was paid. However, that deal was never finalized. In 2007, Keith’s brother, Kyle, approached Pat to discuss Kyle’s purchase of Pat’s interest in Roon-field for $500,000.00, which could have resulted in the Edenfield brothers each owning a 50% membership interest in Roonfield. While Pat agreed to Kyle’s proposal, Kyle could not complete the financial arrangements in order to make the purchase final. Discussions continued, and on August 30, 2007, Pat and Keith closed on a sale in which Pat assigned his 50% membership interest in Roonfield to Keith for $500,000.00. Consequently, after the assignment was complete Keith owned 100% of the membership interest in Roonfield.
_JjA dispute arose, however, over what was actually sold to Keith in the Roonfield assignment. The language of the assignment document was silent as to CFMB-Inc. and CFMB-BR. The document explicitly stated that the assignment represented “the complete understanding between the parties ..., and supersedes all prior negotiations, representations, guarantees, warranties, promises, statements, or agreements, either written or oral, between the parties.” Despite this language, Keith maintained that after the closing he owned 100% of the entire Baton Rouge business operations (Roonfield and CFMB-BR). Keith stated that he had a verbal agreement with Pat where Keith paid $500,000.00 for Pat’s 50% membership interest in Roonfield as well as CFMB-Inc.’s 50% membership interest in CFMB-BR. Keith paid an additional $213,375.67 in debts owed by CFMB-BR so that the deal could be refinanced. After the closing, CFMB-BR continued to pay Pat a salary of $2,500.00 per month and allowed him to use a credit card that was paid by CFMB-BR, just as before the closing.
On the same day of the closing Keith formed a new L.L.C. called CF-BR. He also opened new bank accounts for CF-BR and began transferring the assets of CFMB-BR into CF-BR. It was not until September 2008, after seeing tax returns for CFMB-BR, that Pat allegedly learned *35 that Keith no longer considered Pat’s company, CFMB-Inc, a co-owner of CFMB-BR. At that time, Pat also purportedly learned about Keith’s new company, CF-BR, in which Kyle had a membership interest, and that Keith and/or Kyle had transferred all of CFMB-BR’s assets into the new company. Because Pat denied that CFMB-Inc. sold its 50% membership interest in CFMB-BR at the same time that Keith purchased Pat’s 50% membership interest in Roonfield, Pat consulted an attorney.
This lawsuit was filed on December 2B, 2008, on behalf of CFMB-Inc. and CFMB-BR for damages, an accounting, and in-junctive relief against Keith and his new business, CF-BR. CFMB-Inc. and CFMB-BR specifically alleged that Keith | ^and CF-BR wrongfully converted CFMB-Inc.’s one-half interest in the assets of CFMB-BR. The same allegations were later made against Kyle, when he was added as an additional defendant in a supplemental and amending petition on June 29, 2010. Keith and CF-BR defended the lawsuit on the grounds that CFMB-Inc. no longer had any ownership interest in the assets of CFMB-BR after the closing date on August 30, 2007, and alternatively, that Keith and CF-BR were entitled to a credit for the payment of debts made on behalf of CFMB-Inc. and CFMB-BR.
A four-day jury trial was held in August 2012. The jury ultimately found that CFMB-Inc. did not sell its membership interest in CFMB-BR to Keith or CF-BR when Pat sold his membership interest in Roonfield to Keith on August 30, 2007. Additionally, the jury found that Keith and CF-BR, but not Kyle, had wrongfully converted CFMB-Inc.’s one-half interest in CFMB-BR, and that the value of the assets converted by Keith and CF-BR was $601,330.00. The trial court signed a judgment rendered in accordance with the jury verdict, and thereafter, denied Keith and CF-BR’s motions for new trial, remittitur, and judgment notwithstanding the verdict.
Keith and CF-BR appeal, asserting error in the jury’s failure to recognize that a sale of all of Pat and CFMB-Inc.’s interests in the entire Baton Rouge operation took place on August 30, 2007; thus, it was error to award damages for conversion. The defendants also argue there was insufficient evidence to award damages and that the trial court erred in allowing the valuation testimony of the plaintiffs’ expert. Alternatively, the defendants argue that the damage award was excessive because it failed to consider Keith’s 50% membership interest in CFMB-BR and the defendants’ payment of CFMB-BR’s debts.
STANDARD OF REVIEW
It is well-settled that a court of appeal may not set aside a jury’s finding of fact in the absence of manifest error, and where there is conflict in the testimony, ^reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable, Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where two permissible views of the evidence exist, the jury’s choice between them cannot be manifestly erroneous. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 883 (La.1993). “[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.” Id., 617 So.2d at 882. We review the record before us in accordance with this standard.
*36 LAW AND ANALYSIS

Agreement to Sell

This action for conversion revolves around the issue of whether there was an oral agreement between Keith and Pat for the sale of the entire Baton Rouge business operation, including Roonfield’s property and building, and CFMB-BR’s assets and inventory. Pat maintains that he only agreed to assign his one-half interest in Roonfield (the property and building) to Keith for $500,000.00, which allowed for Keith to own 100% of Roonfield. Conversely, Keith insists that the agreement was for Pat to assign his one-half interest in Roonfield along with CFMB-Inc.’s one-half interest in CFMB-BR, which would make Keith owner of 100% of the entire Baton Rouge business operation. The written assignment stated that it was Pat’s intent to assign his 50% membership interest in Roonfield to Keith. CFMB-Inc. and CFMB-BR are not mentioned in the assignment.
There is no written document in the record evidencing Pat’s alleged intent to assign or sell CFMB-Inc.’s one-half interest in CFMB-BR to Keith. This fact is not in dispute, as the parties’ experts and the banker all agreed. While Keith acknowledges there is no written documentation of the agreement, he maintains that he and Pat had an oral agreement for the entire Baton Rouge business |7operation to be assigned to Keith. The jury, however, found no evidence of any agreement — written or verbal — to sell CFMB-Inc.’s one-half interest in CFMB-BR to Keith when Pat sold his one-half interest in Roonfield to Keith. Defendants argue that the jury’s finding was manifestly erroneous.
To meet the burden of proving an-oral agreement to sell something valued over five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances. See La. Civ.Code art. 1846. A party may serve as his own witness and the “other corroborating circumstances” may be general and need not prove every detail; however, the corroborating circumstances that are required must come from a source other than the party claiming the oral agreement. See Pennington Const., Inc. v. R A Eagle Corp., 94-0575 (La.App. 1st Cir.3/3/95), 652 So.2d 637, 639. Further, the existence or non-existence of a contract is a question of fact, and the jury’s determination of this issue will not be disturbed unless manifestly erroneous. Townsend v. Urie, 2000-0730 (La.App. 1st Cir.5/11/01), 800 So.2d 11, 15, writ denied. 2001-1678 (La.9/21/01), 797 So.2d 674. Similarly, the issue of whether there were corroborating circumstances sufficient to establish an oral contract is a question of fact. Pennington Const., 652 So.2d at 639.
When evaluating the evidence needed to establish the existence of a contract, the jury is allowed to make credibility determinations. Imperial Chemicals Ltd. v. PKB Scania (USA), Inc., 2004-2742 (La.App. 1st Cir.2/22/06), 929 So.2d 84, 93, writ denied, 2006-0665 (La.5/26/06), 930 So.2d 31. The jury heard conflicting testimony and made a decision based on its consideration of all the evidence presented. We will now consider the evidence from each party’s perspective.
According to Pat, he and his wife have membership interests in CFMB-Inc., but he is the only officer; and CFMB-Inc. owns one-half of CFMB-BR in Baton IsRouge. Pat testified that he and Keith each owned a 50% membership interest in Roonfield (prior to the August 30, 2007 assignment), and Roonfield leased the land and building it owned on Airline Highway to CFMB-BR, d/b/a Flooring Depot, U.S.A., which was equally owned by CFMB-Inc. and Keith. Pat stated that *37 sometime after Hurricane Katrina in 2005, Keith informed him of a potential buyer for the Airline property and building owned by Roonfield. According to Pat, the price that he and Keith agreed to sell the property and building for was $2.1 million so that he and Keith would each clear $500,000.00 after the debts were paid. However, the potential buyer declined to purchase the Roonfield property/building at that price.
Pat further testified that in April 2006, he sold the assets, goodwill, inventory, and receivables of CFMB-Inc. in New Orleans to his son’s company, CF-GC, while specifically retaining CFMB-Inc.’s interest as the half-owner of CFMB-BR in Baton Rouge. Pat stated that Keith’s brother, Kyle, who ran the operations of CFMB-BR, approached him about purchasing Pat’s one-half interest in Roonfield for $500,000.00, but Kyle was not financially prepared to buy at that time. Shortly after that discussion, Pat stated that he agreed to sell only his one-half membership interest in Roonfield to Keith for $500,000.00. Keith and Pat closed on the Roonfield sale on August 80, 2007, where Pat appeared in his personal capacity as half-owner of Roonfield, not on behalf of CFMB-Inc. Kyle was not involved in the closing for the Roonfield assignment, even though Pat initially thought he was selling his one-half interest in Roonfield to both Keith and Kyle. Pat testified that Roon-field assets did not include any of the flooring business assets owned by CFMB-BR. Further, the $500,000.00 check that he received was made payable to him personally, not CFMB-Inc.
After the sale of Roonfield, Pat testified that he believed he was still in business with Keith because the sale of Roonfield did not affect the flooring |nbusiness they owned together (CFMB-BR) in Baton Rouge. Pat continued to receive the same monthly salary and the use of a CFMB-BR credit card after the sale of Roonfield. Pat also testified that six to seven months after he sold his interest in Roonfield to Keith, he signed a document as an officer and guarantor on behalf of CFMB-BR to continue to allow the processing of credit card purchases.
Pat denied knowing anything about Keith’s alleged acquisition of CFMB-Inc.⅛ one-half share of CFMB-BR until September 2008, which was a year after the closing date for the Roonfield deal. It was at that point that Pat learned about CF-BR, the new company that Keith and Kyle formed shortly before the Roonfield closing. He also discovered that Keith and Kyle’s new company was doing business as Flooring Depot U.S.A. and Floorscapes, which is what CFMB-BR had always done. In November 2008, Pat received a letter from Keith’s attorney stating Keith’s position that Pat sold his interest in CFMB-BR on August 30, 2007, for $500,000.00 plus one year’s salary and the use of a company credit card, that Keith had assumed all assets and liabilities of CFMB-BR, and that the Baton Rouge business was now being operated as CF-BR. This lawsuit was filed the next month because Keith and CF-BR refused to return the assets of CFMB-BR.
According to Keith, Pat approached him after Hurricane Katrina, near the beginning of 2006, to discuss selling the Baton Rouge operations. Keith stated that Pat wanted out of the business. Keith indicated that Pat was also attempting to put together a deal to sell the New Orleans operations at that time, and in April 2006, Pat sold the assets of CFMB-Inc. in New Orleans to his son’s new company, CF-GC. After Pat sold the New Orleans operations, Keith stated that he and Pat talked informally numerous times about Keith purchasing the Baton Rouge business.
*38 Keith testified that he and Pat verbally agreed on a price of $500,000.00 for Pat to “walk away” from the Baton Rouge business, which included the Roonfield property. In April 2007, Keith began submitting the necessary paperwork for |1 prefinancing the agreed upon price for the entire Baton Rouge operation. He stated that the agreement involved him taking over all of the old debt of CFMB-BR, to continue paying Pat’s salary for a year, to continue giving Pat the use of a credit card for one year, and paying Pat $500,000.00, Keith insisted that he and Pat closed on the sale of the entire Baton Rouge operation on August 30, 2007.
Additionally, Keith testified that the refinancing he personally took on at the August 80, 2007 closing involved paying off all the debt owed by Roonfield and CFMB-BR. Keith indicated that he would have never paid off the entire business debt if he had not acquired the entire business, and that the Roonfield property was useless to him without the accompanying flooring business. Keith adamantly asserted that Pat knew the sale was for everything — the Baton Rouge business and the Airline property/building — and that Pat agreed to the deal because he was ready to get out of the flooring business and happy to have the debt paid off. Keith stated that he did not take the assets of CFMB-BR; rather, he paid for them and Pat knew that Keith was transferring those assets into a new business, CF-BR, at the time of the closing on the deal. Keith acknowledged that he paid Pat personally for the assets of CFMB-BR instead of CFMB-Inc, because he made the deal directly with Pat.
Kyle also testified at trial, but he admitted that he was not involved in the transaction that resulted in the disputed sale to Keith. However, Kyle stated that he, Keith, and Pat spoke many times about Pat wanting out of the Baton Rouge business in 2006. According to Kyle, they informally discussed how Keith and Kyle intended to be partners when Pat was bought out of the Baton Rouge business. Kyle confessed that he did not attend the closing on August 30, 2007, and he has not seen any of the documents about the deal.
Clearly, the jury listened to this contradictory testimony and carefully considered all of the evidence, before finding there was no evidence of a sale — [written n or verbal — of CFMB-Inc.’s one-half interest in CFMB-BR. In light of the conflicting evidence in the record, we find no manifest error in the jury’s determination that Keith failed to carry his burden of proving that he and Pat had an oral agreement regarding the sale of CFMB-Inc.’s one-half membership interest in CFMB-BR.

Conversion

Next we consider the jury’s finding that Keith and CF-BR wrongfully converted the assets of CFMB-BR. Conversion is an intentional tort that consists of an act in derogation of the plaintiffs’ possessory rights. Aymond v. State, Dept. of Revenue and Taxation, 95-1663 (La.App. 1st Cir.4/4/96), 672 So.2d 273, 275. Any wrongful exercise or assumption of authority over another’s goods, depriving him of the possession, permanently or for an indefinite time is a conversion. Id. Our supreme court has held that conversion is committed when any of the following occurs: (1) possession is acquired in an unauthorized manner; (2) the goods are removed from one place to another with the intent to exercise control over them; (3) possession of the goods are transferred without authority; (4) possession is withheld from the owner or possessor; (5) the goods are altered or destroyed; (6) the goods are used improperly; or (7) ownership is asserted over the goods. See Dual Drilling Co. v. Mills Equipment Invest *39 ments, Inc., 98-0343 (La.12/1/98), 721 So.2d 853, 857, Thus, the conversion action is predicated on the fault of the defendant and directed to the recovery of the goods or, in the alternative, the plaintiff may demand compensation. Id. See also, Snow v. Weyant, 2004-1438 (La.App. 1st Cir.8/3/05), 923 So.2d 34, 38.
After a thorough review of the record, we find there is a reasonable factual basis for the jury’s determination that Keith and CF-BR converted the assets of CFMB-Inc. and CFMB-BR. The jury’s finding of conversion is not manifestly erroneous in light of the conclusion that the parties did not have an agreement to | Tasell the assets of CFMB-BR, and considering the fact that CFMB-BR’s assets were un-disputedly transferred to another company, CF-BR, with the intent that CF-BR would have control and dominion over them. Since there is insufficient evidence that Keith or CF-BR had the authority to sell or take possession of 100% of CFMB-BR’s assets, it follows that Keith’s acknowledged transfer of all the assets to CF-BR constituted an unlawful conversion.
We find no merit to the defendants’ argument that conversion is impossible since Keith co-owned the assets of CFMB-BR, That line of reasoning ignores the established fact that Keith and CF-BR transferred all of CFMB-BR’s assets that were half-owned by CFMB-Inc. without CFMB-Inc.’s authority. Keith and CF-BR exercised dominion and control over assets that they did not legally possess given that they were half-owned by CFMB-Inc. The improper dominion exercised by Keith and CF-BR over CFMB-Inc.’s half-interest in CFMB-BR’s assets seriously interfered -with CFMB-Inc.’s ownership rights. These facts clearly meet the definition of conversion. See Dual Drilling, 721 So.2d at 857. We also disagree with the defendants’ contention that the plaintiffs somehow sanctioned the transfer of the assets. The evidence reasonably supports a finding that Pat was unaware of the transfer of the assets until a full year had passed; thus, Pat could not have consented to the transfer of assets on behalf of CFMB-Inc. We further note that since the assets are now a part of Keith’s new business, CF-BR, the record does not support a finding that the assets can be returned to CFMB-BR or CFMB-Inc. Accordingly, the plaintiffs are entitled to demand compensation for the wrongfully converted assets. See Snow, 923 So.2d at 38.

Damages

The measure of damages for tor-tious conversion, when the property cannot be returned to the plaintiffs, is the value of the property at the time of conversion. See Dual Drilling, 721 So.2d at 857-858; Matherne v. Terrebonne Parish Police Jury, 462 So.2d 274, 279 (La.App. 1st Cir.1984), writs denied, 463 So.2d 1321 (La.1985). See also, Gurst v. City of Natchitoches, 428 So.2d 502, 504-505 (La.App. 3d Cir.1983). Keith and CF-BR maintain that the jury did not hear competent evidence regarding valuation, that the jury award was excessive and contrary to the law and evidence, and that the trial court erred in allowing the plaintiffs’ expert to testify as to business valuation because the expert was not qualified to give valuations and his methodology was questionable. The plaintiffs contend that the jury heard conflicting expert testimony and chose to accept the valuation offered by the plaintiffs’ expert. The plaintiffs also argue that the trial court did not abuse its discretion in allowing the plaintiffs’ expert to testify regarding the value of CFMB-BR’s business.
It is well-settled that a jury is given great discretion in its assessment of *40 quantum for both general and special damages. Guillory v. Lee, 2009-0075 (La.6/26/09), 16 So.3d 1104, 1116. The adequacy of a jury’s damage award should be determined on the basis of the facts and circumstances peculiar to the case under review. Abuse of discretion must be clearly demonstrated before an appellate court may tamper with an award of damages. Callison v. Livingston Timber, Inc., 2002-1323 (La.App. 1st Cir.5/9/03), 849 So.2d 649, 655. It is well settled that a trial court is accorded broad discretion in determining whether expert opinion evidence should be held admissible and its decision will not be overturned absent an abuse of discretion. Williams v. Our Lady of the Lake Hosp., Inc., 2009-0267 (La.App. 1st Cir.9/11/09), 22 So.3d 997, 1000. The trier of fact is free to accept or reject in whole or in part the testimony of any witness. Rosell 549 So.2d at 844. Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error. Hanks v. Entergy Corp., 2006-477 (La.12/18/06), 944 So.2d 564, 581.
114The day before the trial on the merits in this case, the trial court held a hearing on the defendants’ motion to strike the plaintiffs’ expert, Matthew C. Person. Mr. Person, testified at the hearing and at trial that he was a certified public accountant (C.P.A.) licensed to practice in Louisiana and that he provided consulting, business management, and business valuation services. Mr. Person admitted that he did not have any special business valuation accreditations, but he stated that accreditation is not required. Because Mr. Person was asked to perform the business valuation three years after CFMB-BR went out of business, he stated that he was limited in the valuation methods that he could use because all that he had available were income tax returns. Mr. Person used two methods, both considering goodwill but not the debts assumed by Keith, to value CFMB-BR at the time of the conversion in August 2007. He used the Rule of Thumb method, which is market driven and based on sales. He also used a Revenue Ruling from the IRS, which is a balance sheet/formula approach to valuation. Mr. Person testified that he could not use other valuation standards because of insufficient relevant data. In due course, the trial court allowed Mr. Person to testify at trial as an expert C.P.A. in the area of standards and measures. Mr. Persons opined that CFMB-BR had a total value of $1,202,660.00 and that CFMB-Inc.’s one-half interest in CFMB-BR was worth $601,330.00, which was what the jury ultimately awarded the plaintiffs in damages.
Based on Mr. Person’s qualifications and the evidence in the record, we cannot say that the trial court abused its vast discretion in allowing Mr. Person to offer expert opinion evidence on the value of CFMB-BR. Likewise, we do not find that the jury abused its discretion or manifestly erred in relying on Mr. Person’s testimony to determine the appropriate value of CFMB-BR for calculating the amount of damages sustained by the wrongful conversion of CFMB-BR’s assets. The jury heard from the defendants’ expert, Mr. Mark W. |15Shirley, who was also a licensed C.P.A. with a practice that concentrated in business valuation and financial analysis. Mr. Shirley used the same data as Mr. Person to conduct his valuation of CFMB-BR, but he used an asset method called book value, that took into consideration the debts as well as assets. Mr. Shirley determined that Pat had been adequately compensated by the $500,000.00 payment he received on August 30, 2007, as well as receiving the *41 benefit of having the debts of CFMB-BR paid off.
Each expert criticized the other expert’s methodology, most notably the exclusion of marketable goodwill from the valuation method used by Mr. Shirley. After listening to both experts’ conflicting testimony, the jury was free to accept Mr. Person’s opinion that CFMB-Inc.’s one-half share of CFMB-BR was valued at $601,330.00. Given the evidence in the record, we find that the jury’s acceptance of Mr. Person’s valuation testimony was not manifestly erroneous.
We do find, however, that the jury manifestly erred when it assessed damages for the full value of CFMB-Inc.’s share of the converted property without taking into consideration the amount of debt that was paid off on behalf of CFMB-BR. Cf. Dual Drilling, 721 So.2d at 858 (where the Supreme Court found manifest error in the award of full value for new equipment at the time of the conversion without allowance for depreciation of the equipment). There is ample evidence in the record that Keith’s refinancing of CFMB-BR’s debt ultimately benefitted CFMB-Inc. The record reflects that while Pat may not have actually known that CFMB-BR’s debts had been paid at the time of the closing on the Roonfield assignment, the debts were in fact paid off, releasing CFMB-Inc. from further liability on CFMB-BR’s debts.
Jerald W. Denicola, Jr., the banker who processed Keith’s refinancing loan for the closing on August 30, 2007, testified that CFMB-BR’s debts were paid off so that money could be lent to Keith and his new company, CF-BR. The payment 11fiof CFMB-BR’s debt clearly enhanced the value of CFMB-BR and benefitted Pat, as 100% owner of CFMB-Inc, which owned a one-half membership interest in CFMB-BR. Pat left the closing with a $500,000.00 payout, a continuance of his salary, and the extended use of a company credit card. Keith, on the other hand, left the closing owning the Airline Highway property/building, a new company, CF-BR, that was in debt due to the refinancing of the Baton Rouge business operations and property/building, and the assets of CFMB-BR.
The evidence shows the total amount of CFMB-BR’s debt that was paid off was $213,378.68. One-half of the debt pay-off should have been figured into the full value of CFMB-BR, since CFMB-Inc. was responsible for only half of CFMB-BR’s debt. Thus, $106,689.34 should be offset and deducted from the total damage award. Accordingly, we amend the amount awarded to the plaintiffs, CFMB-Inc. and CFMB-BR, to a total of $494,640.66, which reflects the debt of CFMB-BR paid by Keith.
CONCLUSION
For the outlined reasons, the September 7, 2012 judgment of the trial court is amended in part to reduce the amount of damages awarded to the plaintiffs, Commercial Flooring and Mini Blinds, Inc. and Commercial Flooring and Mini Blinds of Baton Rouge, L.L.C., from $601,330.00 to $494,640.66, together with legal interest from December 23, 2008, until paid, plus all trial court costs to be taxed separately. As amended, the trial court judgment is affirmed. Costs of this appeal are assessed equally between the parties, one-half to the plaintiffs and one-half to the defendants.
AMENDED IN PART AND AS AMENDED, AFFIRMED.
KUHN, J., concurs.