

# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## NUMBER 2019 CA 1166

### PREMIER TUGS, LLC

### VERSUS

### CAILLOU ISLAND TOWING COMPANY, INC.

Judgment Rendered: **JUN 1 8 2020** ,

Appealed from the
Sixteenth Judicial District Court
In and for the Parish of St. Mary
State of Louisiana
Docket Number 131,113

Honorable Anthony Thibodeaux, Judge Presiding

\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Allan L. Durand<br>Lafayette, LA | Counsel for Plaintiff/Appellee,<br>Premier Tugs, LLC |
| Christopher H. Riviere<br>William N. Abel<br>Todd M. Magee<br>George M. Riviere<br>Thibodaux, LA | Counsel for Defendant/Appellant,<br>Caillou Island Towing, Inc. |

\*\*\*\*\*\*\*\*\*\*\*\*\*

## BEFORE: WHIPPLE, C.J., GUIDRY, AND BURRIS,[1] JJ.

---

[1] Honorable William J. Burris, retired, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court.

**WHIPPLE, C.J.**

This case is before us on appeal by defendant, Caillou Island Towing, Inc., from a judgment of the trial court rendered on an open account in favor of plaintiff, Premier Tugs, LLC. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

The underlying facts giving rise to this litigation are not in dispute. The record establishes that Caillou Island Towing Company, LLC, (Caillou) received requests for tug services from two of its customers, Galveston Bay Energy and James Whitson, Jr. Caillou did not have the necessary vessels available to complete the job; thus, Caillou contacted Premier Tugs, LLC, (Premier); and, without informing Premier who the customers were, Caillou requested that Premier complete the jobs for them. In the towing industry, this arrangement is commonly referred to as "brokering" the tugs, which is how both parties refer to the arrangement throughout the litigation. Premier completed the jobs per Caillou's instructions and invoiced Caillou for the jobs by Invoice #4442 in the amount of $6,355.00 and Invoices #4640 and #4641, in the amount of $32,250.00 each, for a total of $70,855.00. Caillou then drew up invoices on its own letterhead, added a ten percent "brokerage fee" to the invoices, and sent them to their customers for payment. At some point thereafter, before paying the invoices, Galveston Bay Energy went bankrupt and James Whitson, Jr. died.

While Premier and Caillou often entered into these "brokerage" agreements with each other, no written agreement existed between the parties with regard to payment for the work which gave rise to these invoices.[2] Although both parties

---

[2] While a written brokerage agreement currently exists between the parties, they entered into the agreement subsequent to the work at issue in this matter and it is silent as to payment for work done when acting as a broker.

admit that this exact situation has never occurred between the parties, Caillou contended that, per custom, it was not responsible for paying Premier for the work done until Caillou was paid by the customers.[3]

As a result of Caillou's failure or refusal to pay the invoices, on May 15, 2017, Premier filed suit against Caillou under Louisiana's open account statute,[4] seeking to recover the amounts owed on the outstanding invoices, along with attorney's fees as provided by statute. Caillou filed an answer and reconventional demand alleging, among other things, that it was not responsible for paying the obligations of a third party; discharge in bankruptcy by the obligor; discharge by death of the obligor; and estoppel based upon custom in the industry and the agreement between the parties.[5] After conducting discovery and other pre-trial litigation, the case went to bench trial on February 4, 2019. The evidence consisted of the testimony of several employees and owners of both companies, emails between the parties, various invoices related to the jobs at issue, Premier's demand letter to Caillou for payment, a listing of attorney's fees allegedly owed to Premier, accounts payable reports, and Premier's estimated costs of completing the jobs.

After considering all of the evidence submitted, the trial court found that Caillou had requested that Premier complete the jobs at issue. Premier completed the jobs and Caillou was then invoiced for the jobs. The court concluded that pursuant to industry standard, Caillou became responsible for collecting the debts from the ultimate customers. The trial court further found that, because Caillou did not tell Premier who the ultimate customers were, and Premier did not have a relationship

---

[3] Although Caillou repeatedly contended throughout the litigation that as per industry custom, it was not required to pay Premier until paid by the customers, Caillou does not raise this argument on appeal in its assignment of error. See Uniform Rules, Courts of Appeal, Rule 1-3.

[4] See LSA-R.S. 9:2781, *et seq.*

[5] In its reconventional demand, Caillou alleged that Premier was indebted to it in the amount of $10,169.44. However, the parties later stipulated that the reconventional demand was settled.

3

with the ultimate customers, Premier did not have the ability to collect on the debts. Accordingly, on February 19, 2019, after finding that the substance of the agreement between Premier and Caillou was the rental of Premier's services to Caillou, the trial court rendered judgment in favor of Premier for $70,855.00 as well as $11,000.00 in attorney's fees under the open accounts statute.

Caillou then filed the instant appeal, assigning the following as error:

1. The trial court erred in finding that a rental agreement existed between the parties.

2. The trial court erred in finding that a contract existed between the parties, instead of finding that the appellee, Premier was seeking to enforce an unenforceable suretyship agreement.

3. The trial court erred in finding that an open account existed between the parties.

4. Alternatively, if an open account did exist between the parties, the trial court committed error by awarding attorney's fees to the appellee, Premier pursuant to Louisiana's open account law.

## DISCUSSION

### Contractual Relationship
### (Assignments of Error #1 and #2)

On appeal, Caillou contends that it was error for the trial court to find both that a contract existed between the parties and that the substance of the contract was a rental agreement, when in fact, the arrangement was an unenforceable suretyship agreement.[6]

A contract is formed by consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract,

---

[6] As these assignments of error are interrelated, we have considered them together.

offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances clearly indicates consent. LSA-C.C. art. 1927; Casey v. National Information Services, Inc., 2004-0207 (La. App. 1st Cir. 6/10/05), 906 So. 2d 710, 719, writ denied 2005-2210 (La. 3/24/06), 925 So. 2d 1235. When a writing is not required by law, a contract not reduced to writing, for a price or value above $500.00, must be proved by at least one witness and other corroborating circumstances. LSA-C.C. art. 1846; Suire v. Lafayette City-Parish Consolidated Government, 2004-1459 (La. 4/12/05), 907 So. 2d 37, 58. To meet the burden of proving an oral contract by a witness and other corroborating circumstances, a party may serve as his own witness and the "other corroborating circumstances" may be general and need not prove every detail of the plaintiff's case. The corroborating evidence, however, must come from a source other than the plaintiff. Pennington Construction, Inc. v. R A Eagle Corporation, 94-0575 (La. App. 1st Cir. 3/3/95), 652 So. 2d 637, 639.

The existence of a contract is a question of fact. Townsend v. Urie, 20000730 (La. App. 1st Cir. 5/11/01), 800 So. 2d 11, 15, writ denied, 2001–1678 (La. 9/21/01), 797 So. 2d 674. Further, whether there were corroborating circumstances sufficient to establish an oral contract is also a question of fact. Pennington Construction, Inc., 652 So. 2d 637, 639. It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So. 2d 840, 844 (La. 1989). Under the manifest error standard of review, a reviewing court may not merely decide if it would have found the facts of the case differently. Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 2014-2592 (La.

12/8/15), 193 So. 3d 1110, 1115. Rather, this court employs a two-part test for the review of a factfinder's determinations. Stobart v. State through Dept. of Transp. and Development, 617 So. 2d 880, 882 (La. 1993). To reverse a trial court's factual conclusions, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Walton v. State Farm Mut. Auto. Ins. Co., 2018-1510 (La. App. 1st Cir. 5/31/19), 277 So. 3d 1193, 1196.

This court's determination is not whether the factfinder was correct, but whether the factfinder's conclusion was a reasonable one. Stobart, 617 So. 2d 880, 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, 549 So. 2d 840, 844. Thus, where there are two permissible views of the evidence, the factfinder's choice cannot be manifestly erroneous or clearly wrong. Walton, 277 So. 3d 1193, 1196; Rosell, 549 So. 2d 840, 844.

Further, when findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the fact finder can be aware of the variation in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, 549 So. 2d 840, 844. Indeed, where the fact finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. Martinez v. Wilson, 2019-0017 (La. App. 1st Cir. 9/27/19), 287 So. 3d 27, 31.

After considering all of the evidence, the trial court found that an oral contract existed between Premier and Caillou for the rental of Premier's services. On the record before us, we are unable to conclude that this factual finding is clearly wrong,

6

as the record amply supports the trial court's factual findings. The testimony was consistent that the parties had a standing relationship wherein they could call each other when they needed to complete a job, but did not have the necessary vessels to do so. As to the specific instances at issue in this matter, both parties testified that Caillou contacted Premier and offered Premier an opportunity to complete the jobs. Premier accepted the jobs, and completed them as requested. Accordingly, considering the evidence presented at trial, the trial court's determination that there was sufficient corroborating circumstances to prove a contract was not clearly wrong.

As to the substance of the contract, Caillou contends on appeal that because it was only acting as a broker and did not receive any benefit from the agreement, Premier is seeking to enforce, at best, an unenforceable suretyship agreement. In support of its argument, Caillou contends that it was acting merely as a "billing medium" and could not be held responsible for the customers' failure to pay. Finally, Caillou contends that, because it was only a broker or "billing medium," a finding that it was responsible for the outstanding debts would be tantamount to enforcing an unenforceable implied or tacit suretyship.

Conversely, Premier's witnesses testified that while the arrangement is commonly referred to in the boating industry as brokering, Premier considered the nature of the business arrangement to be a rental of its services to allow Caillou to complete a job. Moreover, Premier points out that at no point during the trial did any witness testify that they believed it was a suretyship agreement, only that they believed Caillou did not have to pay until Caillou was paid by the customers. Finally, Premier contends that even if the contract was one in which Caillou did not have to pay Premier until it was paid by the customer, such a contract would have been illegal and unenforceable under prior decisions of this court governing payment to subcontractors.

7

After considering the evidence the trial court found that this contract was not a suretyship agreement, stating that the substance of the agreement was the rental of Premier's services to Caillou in order to allow Caillou to complete the job for its customer. This finding is supported by the testimony of Joan Cenac, the office manager at Caillou, who stated, "if we don't have a boat available, [operations] call[s] a broker boat company... so we can do the job" for the customer. Ms. Cenac further testified that they employ this procedure to complete the job because they want the customer to call Caillou, not Premier, for any future jobs. This testimony supports the trial court's finding that the substance of the agreement was the rental of Premier's services to allow Caillou to complete the job for its customers.

Additionally, the Louisiana Supreme Court has found that pay-when-paid provisions in a written contract between a contractor and a subcontractor "are not suspensive conditions, but rather, terms for payment which only delay the execution of the...general contractors' obligations to make payment, and then only for a reasonable period of time."[7] Southern States Masonry, Inc. v. J.A. Jones Const. Co., 507 So. 2d 198, 200 (La. 1987). In Southern States Masonry, the owner filed for bankruptcy before fully paying the general contractors, one of whom filed a proof of claim in the bankruptcy proceedings, but was unable to recover the funds. The Supreme Court found that the parties to the contracts always presumed the owner would pay the price due and did not contemplate a possible insolvency. Accordingly, the Court found that the provisions did not create suspensive conditions, but "terms for payment which at most retard the execution of the contractor's obligation for a reasonable time." Southern States Masonry, 507 So. 2d 198, 202.

---

[7] A suspensive condition is one in which the obligation may not be enforced until the uncertain event occurs. LSA-C.C. art. 1767.

8

While the relationship between Premier and Caillou is not that of a contractor-subcontractor and the parties did not have a written contract, as they did in Southern States Masonry, Caillou did contract with Premier to complete a job for Caillou's customers. Moreover, Premier did not have a contract to complete the job with the customers; in fact, each time Premier went out to complete the jobs, Premier employees were not aware of the customer's identity. Similar to Southern States Masonry, one of Caillou's customers filed for bankruptcy and the other is now deceased, preventing payment on Caillou's invoices.[8] Thus, although Caillou claims it is not responsible for paying the Premier invoices sent to Caillou, as in the Southern States Masonry case, Caillou was responsible for collecting the outstanding debts from the customers and then remitting payment to Premier. The fact that the customers are no longer able to pay does not relieve Caillou of its obligation to remit payment to Premier, who relied on Caillou to collect the sums owed in accordance with their contractual relationship. As the trial court recognized, Premier had no contractual relationship with the Caillou customers.

Accordingly, on the record before us, and particularly the nature of the agreement between Premier and Caillou, we find no error by the trial court in its finding that a contract existed between the parties and that the substance of the agreement was that of the rental of Premier's services to Caillou.

Thus, these assignments of error lack merit.

### Open Account Statute
### (Assignments of Error #3 and #4)

Caillou further contends that it was error for the trial court to find that an open account existed between the parties and, alternatively, that even if an open account existed, Premier failed to prove its entitlement to attorney's fees under the statute.

---

[8] Similarly, Caillou also filed a proof of claim in the bankruptcy proceeding of its customer, Galveston Bay Energy, as did the contractor in Southern States Masonry, 507 So. 2d 198, 200.

Louisiana Revised Statute 9:2781(D) provides that an open account "includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions." An open account necessarily involves an underlying agreement between the parties on which the debt is based, such that where there is no contractual relationship between the parties, there can be no recovery on an open account basis. Bridges v. Citifinancial Auto Corp., 2018-0734 (La. App. 1st Cir. 11/5/18), 266 So. 3d 939, 942; Accusess Environmental Inc. v. Walker, 2015-0008 (La. App. 1st Cir. 12/17/15), 185 So. 3d 69, 75. Moreover, the mere creation of a debt owed to a party does not give rise to an action on an open account. Inherent in the concept of an open account is that the account is for services or goods rendered. Bridges, 266 So. 3d 939, 942.

In determining whether a contract falls under the open account statute, the court must consider whether the total cost or price is left open or undetermined; whether other business transactions between the parties existed; whether one party extended a line of credit to another; whether there are running or current dealings; and whether there are expectations of future dealings. However, the open account statute does not require multiple transactions or for parties to anticipate future transactions. Shamrock Management, LLC v. GOM Fabricators, LLC, 2018-0491, p. 7 (La. App. 1st Cir. 7/10/19) (unpublished), writ denied, 2019-01255 (La. 10/21/19), 280 So. 3d 1171. The existence of a contract, and specifically an open account, are questions of fact which are subject to the manifest error, clearly wrong standard. Townsend v. Urie, 800 So. 2d 11, 15; Stobart, 617 So. 2d 880, 882.

Further, if a debtor "fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed," the debtor "shall be liable to the claimant for reasonable attorney fees ... when judgment on the claim is rendered in favor of the claimant." LSA-R.S. 9:2781(A).

10

Caillou contends that this is not a suit on open account because Premier did not extend a line of credit to Caillou, but to the customers. Further, Caillou contends that it cannot be deemed liable for payment as the customers received the benefits of Premier's services and Caillou did not receive any benefit from the work. Caillou further contends that even if this is an open account, Premier failed to prove that its entitlement to attorney's fees as provided in the statute because "[t]he record contains no evidence of written demand on [Caillou] by Premier that would trigger the thirty-day period." Conversely, Premier contends that even though Caillou did not perform the services, Caillou was set to receive a benefit from this contract, specifically ten percent of the invoices Caillou sent to its customers. Additionally, Premier points out that its written demand letter was introduced at trial as Plaintiff's Exhibit #1. This exhibit is a written demand letter, dated February 27, 2017, sent by certified mail with a return receipt, demanding payment of $70,855.00 under the open account statute.

As addressed above, we conclude that an underlying contractual agreement existed between the parties, namely, for the rental of Premier's services to Caillou. The testimony indicates that Premier and Caillou have a standing relationship wherein they often call each other in order to complete jobs for their customers when they do not have the boats needed to complete the jobs themselves.[9] Once the work was complete, Premier would issue an invoice to Caillou, not to the customer. Thus, Premier clearly extended a line of credit to Caillou for the rental of Premier's services and Caillou availed itself of such. Had Caillou desired or contracted for a

---

[9] Specifically, Chad Ronsonet, a co-owner of Premier, testified that Caillou rented a boat from Premier "[m]ore than a hundred times." Tim Ronsonet, also the co-owner of Premier, testified that his testimony would be the same as Chad's, indicating he also agreed with Chad's testimony as to the relationship between Premier and Caillou. Brooks Luke, a current employee of Premier who used to work in operations at Caillou, testified that Caillou sent "more than $300,000.00" of work to Premier in the year following the unpaid invoices. Finally, relying on printouts of Caillou's accounts payable, Joan Cenac testified that in 2015, Caillou sent Premier work totaling $935,853.81 and in 2016, Caillou sent Premier work totaling $382,454.83.

11

different relationship, Caillou could have informed Premier of the ultimate customer and asked Premier to bill the customer, not Caillou. Instead, in order to protect Caillou's relationship with its clients, Caillou expected to be billed by Premier, and to be able to reap the benefit of the additional ten percent of the invoice. Thus, Premier's rendering of services benefited Caillou's business and thus Caillou was more than a mere conduit. Cf. Mega Transport, Inc. v. Kieffer, 526 So. 2d 460 (La. App. 5th Cir. 1988).

Here, Caillou was set to receive money on the invoices and did not only act as a conduit. While Caillou was going to transfer most of the money received from the customers over to Premier, Caillou undisputedly was going to retain ten percent of the funds as a "brokerage" fee. Moreover, Premier's services to Caillou allowed Caillou to complete the job for its customer without letting the customer know someone else actually did the job, all of which was to ultimately benefit Caillou's business and its relationship with its customers.

After hearing all of the testimony and reviewing all of the evidence, the trial court found that an open account existed between the parties and that, because Caillou did not issue payment after demand, it was liable to Premier for $70,855.00, the balance of the invoices, as well as $11,00.00 in attorney's fees, which findings are not manifestly erroneous. As the trial court recognized, the parties were operating under an open account with a price scheme in place. Moreover, counsel for Premier introduced Plaintiff's Exhibit #1 at trial, the written demand letter sent to Caillou on February 27, 2017. The letter demanded the full amount owed, which is also the amount that was recovered at trial. Further, the letter clearly stated that all three outstanding invoices were attached to the letter. While the invoices do not appear to be attached to the letter as it was introduced as Plaintiff's Exhibit #1, the letter clearly indicates they were attached when the letter was sent to Caillou. Moreover, Caillou did not object to the letter being admitted at trial as proof of

12

demand, nor did Caillou dispute the statement in the letter noting that the invoices were attached at the time the letter was sent. Additionally, we note that Premier did not institute suit in this matter until May 15, 2017, well beyond the thirty-day period provided for in LSA-R.S. 9:2781(A). Accordingly, we find that the trial court did not err in awarding attorney's fees to Premier as it clearly submitted proof of its written demand in compliance with the statute.

Thus, these assignments of error also lack merit.

## CONCLUSION

For the above and foregoing reasons, the trial court's February 19, 2019 judgment in favor of plaintiff/appellee, Premier Tugs, LLC, is hereby affirmed. Costs of this appeal are assessed to the defendant/appellant, Caillou Island Towing Company, LLC.

**AFFIRMED.**